WATSON and another *v.* BROOKS and another.

*(Circuit Court, D. Oregon.   September 27, 1882.)*

1. SALE OF REAL PROPERTY BY BROKER.

A contract to sell real property for a commission is performed when the broker procures a person who is able to pay for the same to enter into a valid contract to purchase upon the terms proposed, or when he induces such person to offer to pay for the property, and take a conveyance thereof, upon being allowed a reasonable time to examine the title thereto, which offer is refused by the owner, on the ground that the time allowed the broker within which to effect the sale is about to expire.

2. TERRITORY, NOT A STATE.

The ruling in *New Orleans* v. *Winter*, 1 Wheat. 91, that a territory is not "a state," within the meaning of that term as used in the constitution in making the grant of judicial power to the United States, and that, therefore, a resident of the former cannot sue in the national courts as a citizen of a state, followed, but questioned.

Action to Recover Damages.

*William H. Effinger*, for plaintiff.

*H. Y. Thompson*, for defendant Brooks.

*Seneca Smith*, for defendant Dekum.

DEADY, D. J.   The plaintiffs, William P. and Matthew P. Watson, citizens of Washington territory, bring this action against the defendants, S. L. Brooks and Phœbe Dekum, of Oregon, to recover the sum of $2,500, upon the following allegations of fact:

That during the year 1881 the defendants owned a certain property at the Dalles, Oregon, "known as the Dalles Water Company," and engaged the plaintiffs, as their agents, to sell the same, within a certain number of days thereafter,

for the sum of $50,000, and authorized them to represent that they would, "upon a sale being effected, make to the purchaser a good and sufficient conveyance" of the property, "with covenants of general warranty," for which service the plaintiffs were to receive a commission of $2,500, "or all in excess of $47,500 for which they should sell the property;" that, on the last day of the time allowed, the plaintiffs secured a purchaser for the property who was able to pay the sum of $50,000 therefor, and offered to do so upon receiving a conveyance thereof, "provided the defendants would allow him, by his solicitor, to search the title to the same, so that he might be advised as to whether they could convey a perfect title thereto, but that the defendants refused to permit said search or to give time therefor, and thereby refused to complete the sale of said property," and "capriciously and without justifying cause obstructed and prevented a consummation of said sale."

The defendants demur to the complaint, for that (1) the court has not jurisdiction of the parties defendant nor the subject-matter; and (2) the facts stated do not constitute a cause of action.

The case was argued upon both points of the demurrer, and the parties desire that both should be considered by the court.

Upon the second cause of demurrer the defendants claim that the plaintiffs agreed to make a sale of the property, which was not done by simply finding a person who was willing and able to purchase the same in case the title, upon examination, proved good.

A sale of real property is an agreement by the vendor to convey the title thereto or an estate therein to the vendee for a certain valuable consideration then or thereafter to be paid.

The conveyance is not a part of the sale, but only a consequence of it; and the former is complete without the latter, even if it is not followed by it. The legal title remains in the vendor, notwithstanding the sale, until a conveyance is made to the vendee. Bouvier, "Sale," sub. 19.

The plaintiffs undertook to make a sale of this property for a certain price within a certain time, and upon a representation authorized by the defendants to the effect that the title was good. To do this, it was necessary to find some one who was not only able and willing to purchase upon the terms proposed and within the time limited, but who should also agree to do so. And this agreement, to be valid and binding, should be in writing and signed by the purchaser. Or. Civ. Code, § 775, sub. 6.

In such case it matters not whether the transaction is consummated by the delivery of the deed and the payment of the purchase money or not; the person negotiating the sale has performed his undertaking and is entitled to his compensation therefor. The sale

being effected by a valid agreement to a solvent purchaser, the broker has fulfilled his contract and is entitled to his commission; and if the purchaser fails to comply with his agreement, the vendor has his remedy thereon. And if the agreement to purchase is not reduced to writing and therefore not binding, but the parties proceed thereon and complete the transaction by the delivery of the conveyance and the payment of the purchase money, still the broker is entitled to his commission, because the sale made by him in fact is recognized and acted on by the parties, and the vendor has the benefit of his services in bringing the same about.

The case under consideration, however, is different from either of these.

The contract of sale does not appear to have been reduced to writing, nor was it followed by a conveyance of the premises to the proposed purchaser. But no objection was made by the defendants to the contract on that account, or to the solvency of the purchaser, but they refused to go on with the transaction solely upon the ground that the plaintiffs had not effected the sale within the time limited, because the purchaser required a reasonable time thereafter to examine the title to the property before paying for it and taking the conveyance. It is also well understood, and was so assumed on the argument, though it is not so distinctly alleged, that owing to the situation of the parties and the property there was not sufficient time left for the examination of the title after the contract of sale was made, and that, therefore, the refusal of the defendants to accept the offer to purchase, subject to such examination, was in fact a refusal to go on with the transaction, upon the ground that the sale was not and could not be completed within the time agreed upon. And this, it seems to me, is the turning point in this case; so far, at least, as this question is concerned. Could the plaintiffs effect a sale of this property, within the terms of their employment, subject to an examination of the title? I think they could; and that, having done so, they complied with the obligation of their contract and were entitled to their commission. If the contract of sale was made without any stipulation as to the examination of title, the right of the purchaser to the examination would be implied, and if upon such examination it should appear that there was a substantial defect in the title, he might decline to proceed, and still the plaintiffs would be entitled to their commission.

My conclusion upon this point is that the plaintiffs effected a sale of this property—procured a purchaser for it—within the terms of

their agreement, and that the defendants wrongfully refused to complete the transaction, upon the erroneous assumption that such purchaser was not entitled to examine the state of the title before paying the purchase money and taking the conveyance, unless he could do so within the time limited for making the sale. This being so, it follows that the plaintiffs complied with their engagement, and that, so far as it appears, it was the fault of the defendants that the transaction was not completed in accordance with the sale.

In *McGavock* v. *Woodlief,* 20 How. 221, the supreme court, in a case involving this question, says:

"The broker must complete the sale; that is, he must find a purchaser in a situation and ready and willing to complete the purchase on the terms agreed on before he is entitled to his commissions. Then he will be entitled to them, though the vendor refuse to go on and perfect the sale."

The following cases have been examined in the consideration of this question, and, though not exactly in point, they will be found to shed more or less light upon it: *Middleton* v. *Findla,* 25 Cal. 76; *Blood* v. *Shannon,* 29 Cal. 393; *Phelan* v. *Gardner,* 43 Cal. 306; *Knapp* v. *Wallace,* 41 N. Y. 477; *Fraser* v. *Wyckoff,* 63 N. Y. 445; *Cook* v. *Fiske,* 12 Gray, 491; Whart. Ag. § 325. But, upon the other point, the authorities are against the jurisdiction.

The constitution, art. 3, § 2, declares that the judicial power of the United States shall extend to controversies between citizens of different states and citizens of a state and aliens; and this jurisdiction has since been conferred on the circuit courts, where the matter in dispute exceeds the sum or value of $500. 1 St. 78; 18 St. 470.

At an early day it was held, in *Hepburn* v. *Ellzey,* 2 Cranch, 445, that the District of Columbia is not "a state," within the meaning of that term as used in the article of the constitution defining the judicial power of the United States, and therefore a resident thereof could not sue in the United States courts as a citizen of a state. Afterwards, in *New Orleans* v. *Winter,* 1 Wheat. 91, the question arose in regard to a territory, and it was held that a territory was in the same category as Columbia; and though both are states—political societies—in the general sense of the term, neither are in the sense in which the term is used in the constitution, where it is intended only to comprehend "members of the American confederacy." In *Barney* v. *Baltimore City,* 6 Wall. 287, these rulings were followed without question upon the principle of *stare decisis.*

But it is very doubtful if this ruling would now be made if the

question was one of first impression; and it is to be hoped it may yet be reviewed and overthrown.

By it, and upon a narrow and technical construction of the word "state," unsupported by any argument worthy of the able and distinguished judge who announced the opinion of the court, the large and growing population of American citizens resident in the District of Columbia and the eight territories of the United States are deprived of the privilege accorded to all other American citizens, as well as aliens, of going into the national courts when obliged to assert or defend their legal rights away from home. Indeed, in the language of the court in *Hepburn* v. *Ellzey, supra,* they may well say: "It is extraordinary that the courts of the United States, which are open to aliens, and to the citizens of every state in the Union, should be closed upon them." But so long as this ruling remains in force, the judgment of this court must be governed by it.

The demurrer is sustained.