## NATIONAL MUTUAL INSURANCE CO. *v.* TIDE-WATER TRANSFER CO., INC.

. No. 29. Argued November 8, 1948.—Decided June 20, 1949.

*David G. Bress* argued the cause for petitioner. With him on the brief were *Alvin L. Newmyer* and *Sheldon E. Bernstein.*

By special leave of Court, *Solicitor General Perlman* argued the cause for the United States, as *amicus curiae,* urging reversal. With him on the brief were *Assistant Attorney General Morison, Arnold Raum, Paul A. Sweeney* and *Harry I. Rand.*

*Wendell D. Allen* and *Francis B. Burch* argued the cause and filed a brief for respondent.

MR. JUSTICE JACKSON announced the judgment of the Court and an opinion in which MR. JUSTICE BLACK and MR. JUSTICE BURTON join.

This case calls up for review a holding that it is unconstitutional for Congress to open federal courts in the several states to action by a citizen of the District of Columbia against a citizen of one of the states. The petitioner, as plaintiff, commenced in the United States District Court for Maryland an action for a money judgment on a claim arising out of an insurance contract. No cause of action under the laws or Constitution of the United States was pleaded, jurisdiction being predicated only upon an allegation of diverse citizenship. The diversity set forth was that plaintiff is a corporation created by District of Columbia law, while the defendant is a corporation chartered by Virginia, amenable to suit in Maryland by virtue of a license to do business there. The learned District Judge concluded that, while this diversity met jurisdictional requirements under the Act of Congress,[1] it did not comply with diversity requirements of the Constitution as to federal jurisdiction, and so dismissed.[2] The Court of Appeals, by a divided court, affirmed.[3] Of twelve district courts that had considered the question up to the time review in this Court was sought, all except three had held the enabling Act unconstitutional,[4] and the two Courts of Appeals which had

---

[1] Act of April 20, 1940, c. 117, 54 Stat. 143. For terms of the statute see note 10.

[2] No opinion was filed by the District Court, which in dismissing the complaint for lack of jurisdiction relied upon its former decision and opinion in *Feely* v. *Sidney S. Schupper Interstate Hauling System, Inc.*, 72 F. Supp. 663.

[3] 165 F. 2d 531.

[4] The Act had been upheld in *Winkler* v. *Daniels*, 43 F. Supp. 265; *Glaeser* v. *Acacia Mutual Life Association*, 55 F. Supp. 925; and in *Duze* v. *Woolley*, 72 F. Supp. 422 (with respect to Hawaii). It

spoken on the subject agreed with that conclusion.[5] The controversy obviously was an appropriate one for review here and writ of certiorari issued in the case.[6]

The history of the controversy begins with that of the Republic. In defining the cases and controversies to which the judicial power of the United States could extend, the Constitution included those "between Citizens of different States."[7] In the Judiciary Act of 1789, Congress created a system of federal courts of first instance and gave them jurisdiction of suits "between a citizen of the State where the suit is brought, and a citizen of another State."[8] In 1804, the Supreme Court, through Chief Justice Marshall, held that a citizen of the District of Columbia was not a citizen of a State within the meaning and intendment of this Act.[9] This decision closed federal courts in the states to citizens of the District of Columbia in diversity cases, and for 136 years they remained closed. In 1940 Congress enacted the statute challenged here. It confers on such courts jurisdiction if the action "Is between citizens of different States, or

had been held unconstitutional in the District Court in the instant case; in *Central States Co-operatives* v. *Watson Bros. Transportation Co.*, affirmed 165 F. 2d 392, and in *McGarry* v. *City of Bethlehem*, 45 F. Supp. 385; *Behlert* v. *James Foundation*, 60 F. Supp. 706; *Ostrow* v. *Samuel Brilliant Co.*, 66 F. Supp. 593; *Wilson* v. *Guggenheim*, 70 F. Supp. 417; *Feely* v. *Sidney S. Schupper Interstate Hauling System*, 72 F. Supp. 663; *Willis* v. *Dennis*, 72 F. Supp. 853; and in *Mutual Ben. Health & Acc. Assn.* v. *Dailey*, 75 F. Supp. 832.

[5] The Act had been held invalid by the Court of Appeals for the Fourth Circuit in the instant case, 165 F. 2d 531, with Judge Parker dissenting; and by the Court of Appeals for the Seventh Circuit in *Central States Co-operatives* v. *Watson Bros. Transportation Co.*, 165 F. 2d 392, with Judge Evans dissenting.

[6] 333 U. S. 860.

[7] U. S. Const. Art. III, § 2, cl. 1.

[8] § 11 of the Act of Sept. 24, 1789, c. 20, 1 Stat. 73, 78.

[9] *Hepburn & Dundas* v. *Ellzey*, 2 Cranch 445.

citizens of the District of Columbia, the Territory of Hawaii, or Alaska, and any State or Territory." [10] The issue here depends upon the validity of this Act, which, in substance, was reenacted by a later Congress [11] as part of the Judicial Code. [12]

Before concentrating on detail, it may be well to place the general issue in a larger perspective. This constitutional issue affects only the mechanics of administering justice in our federation. It does not involve an extension or a denial of any fundamental right or immunity which goes to make up our freedoms. Those rights and freedoms do not include immunity from suit by a citizen of Columbia or exemption from process of the federal courts. Defendant concedes that it can presently be sued in some court of law, if not this one, and it grants that Congress may make it suable at plaintiff's complaint in some, if not this, federal court. Defendant's contention only amounts to this: that it cannot be made to answer this plaintiff in the particular court which Congress has decided is the just and convenient forum.

The considerations which bid us strictly to apply the Constitution to congressional enactments which invade fundamental freedoms or which reach for powers that would substantially disturb the balance between the Union and its component states, are not present here. In mere mechanics of government and administration we

---

[10] The effect of the Act was to amend 28 U. S. C. (1946 ed.) § 41 (1) so that it read in pertinent part: "The district courts shall have original jurisdiction as follows: . . . Of all suits of a civil nature, at common law or in equity . . . where the matter in controversy exceeds, exclusive of interest and costs, the sum or value of $3,000, and . . . (b) Is between citizens of different States, or citizens of the District of Columbia, the Territory of Hawaii, or Alaska, and any State or Territory . . . ."

[11] Act of June 25, 1948, 62 Stat. 869.

[12] 28 U. S. C. §.1332.

should, so far as the language of the great Charter fairly will permit, give Congress freedom to adapt its machinery to the needs of changing times. In no case could the admonition of the great Chief Justice be more appropriately heeded—". . . we must never forget, that it is *a constitution* we are expounding." [13]

Our first inquiry is whether, under the third, or Judiciary, Article of the Constitution,[14] extending the judicial power of the United States to cases or controversies "between Citizens of different States," a citizen of the District of Columbia has the standing of a citizen of one of the states of the Union. This is the question which the opinion of Chief Justice Marshall answered in the negative, by way of dicta if not of actual decision. *Hepburn & Dundas* v. *Ellzey,* 2 Cranch 445. To be sure, nothing was before that Court except interpretation of a statute [15] which conferred jurisdiction substantially in the words of the Constitution with nothing in the text or context to show that Congress intended to regard the District as a state. But Marshall resolved the statutory question by invoking the analogy of the constitutional provisions of the same tenor and reasoned that the District was not a state for purposes of the Constitution and, hence, was not for purposes of the Act. The opinion summarily disposed of arguments to the contrary, including the one repeated here that other provisions of the Constitution indicate that "the term state is sometimes used in its more enlarged sense." Here, as there, "on examining the passages quoted, they do not prove what was to be shown by them." 2 Cranch 445, 453. Among his contemporaries at least, Chief Justice Marshall was not generally censured for undue literalness in interpreting the lan-

---

[13] *McCulloch* v. *Maryland,* 4 Wheat. 316, 407.

[14] U. S. Const. Art. III, § 2, cl. 1.

[15] See note 8.

guage of the Constitution to deny federal power and he wrote from close personal knowledge of the Founders and the foundation of our constitutional structure. Nor did he underestimate the equitable claims which his decision denied to residents of the District, for he said that "It is true that as citizens of the United States, and of that particular district which is subject to the jurisdiction of congress, it is extraordinary that the courts of the United States, which are open to aliens, and to the citizens of every state in the union, should be closed upon *them*.— But this is a subject for legislative not for judicial consideration." [16]

The latter sentence, to which much importance is attached, is somewhat ambiguous, because constitutional amendment as well as statutory revision is for legislative, not judicial, consideration. But the opinion as a whole leaves no doubt that the Court did not then regard the District as a state for diversity purposes.

To now overrule this early decision of the Court on this point and hold that the District of Columbia is a state would, as that opinion pointed out, give to the word "state" a meaning in the Article which sets up the judicial establishment quite different from that which it carries in those Articles which set up the political departments and in other Articles of the instrument. While the word is one which can contain many meanings, such inconsistency in a single instrument is to be implied only where the context clearly requires it. There is no evidence that the Founders, pressed by more general and immediate anxieties, thought of the special problems of the District of Columbia in connection with the judiciary. This is not strange, for the District was then only a contemplated entity. But, had they thought of it, there is nothing to indicate that it would have been referred to as a state and

---

[16] *Hepburn & Dundas* v. *Ellzey*, 2 Cranch 445, 453.

much to indicate that it would have required special provisions to fit its anomalous relationship into the new judicial system, just as it did to fit it into the new political system.

In referring to the "States" in the fateful instrument which amalgamated them into the "United States," the Founders obviously were not speaking of states in the abstract. They referred to those concrete organized societies which were thereby contributing to the federation by delegating some part of their sovereign powers and to those that should later be organized and admitted to the partnership in the method prescribed. They obviously did not contemplate unorganized and dependent spaces as states. The District of Columbia being nonexistent in any form, much less as a state, at the time of the compact, certainly was not taken into the Union of states by it, nor has it since been admitted as a new state is required to be admitted.

We therefore decline to overrule the opinion of Chief Justice Marshall, and we hold that the District of Columbia is not a state within Article III of the Constitution. In other words, cases between citizens of the District and those of the states were not included in the catalogue of controversies over which the Congress could give jurisdiction to the federal courts by virtue of Art. III.

This conclusion does not, however, determine that Congress lacks power under other provisions of the Constitution to enact this legislation. Congress, by the Act in question, sought not to challenge or disagree with the decision of Chief Justice Marshall that the District of Columbia is not a state for such purposes. It was careful to avoid conflict with that decision by basing the new legislation on powers that had not been relied upon by the First Congress in passing the Act of 1789.

The Judiciary Committee of the House of Representatives recommended the Act of April 20, 1940, as "a rea-

sonable exercise of the constitutional power of Congress. to legislate for the District of Columbia and for the Territories." [17] This power the Constitution confers in broad terms. By Art. I, Congress is empowered "to exercise exclusive Legislation in all Cases whatsoever, over such District." [18] And of course it was also authorized "To make all Laws which shall be necessary and proper for carrying into Execution" such powers.[19] These provisions were not relevant in Chief Justice Marshall's interpretation of the Act of 1789 because it did not refer in terms to the District but only to states. It is therefore significant that, having decided that District citizens' cases were not brought within federal jurisdiction by Art. III and the statute enacted pursuant to it, the Chief Justice added, as we have seen, that it was extraordinary that the federal courts should be closed to the citizens of "that particular district which is subject to the jurisdiction of congress." Such language clearly refers to Congress' Art. I power of "exclusive Legislation in all Cases whatsoever, over such District." And mention of that power seems particularly significant in the context of Marshall's further statement that the matter is a subject for "legislative not for judicial consideration." Even if it be considered speculation to say that this was an expression by the Chief Justice that Congress had the requisite power under Art. I, it would be in the teeth of his language to say that it is a denial of such power. The Congress has acted on the belief that it possesses that power. We believe their conclusion is well founded.

---

[17] H. R. Rep. No. 1756, 76th Cong., 3d Sess., p. 3. The Senate Judiciary Committee's report consists only of a recommendation that the bill (H. R. 8822) be passed. Senate Report No. 1399, 76th Cong., 3d Sess. Passage in each House was without discussion. 86 Cong. Rec., Pt. 3, p. 3015; 86 Cong. Rec., Pt. 4, p. 4286.

[18] U. S. Const. Art. I, § 8, cl. 17.

[19] U. S. Const. Art. I, § 8, cl. 18.

It is elementary that the exclusive responsibility of Congress for the welfare of the District includes both power and duty to provide its inhabitants and citizens with courts adequate to adjudge not only controversies among themselves but also their claims against, as well as suits brought by, citizens of the various states. It long has been held that Congress may clothe District of Columbia courts not only with the jurisdiction and powers of federal courts in the several states but with such authority as a state may confer on her courts. *Kendall* v. *United States,* 12 Pet. 524, 619; *Capital Traction Co.* v. *Hof,* 174 U. S. 1; *O'Donoghue* v. *United States,* 289 U. S. 516. The defendant here does not challenge the power of Congress to assure justice to the citizens of the District by means of federal instrumentalities, or to empower a federal court within the District to run its process to summon defendants here from any part of the country. And no reason has been advanced why a special statutory court for cases of District citizens could not be authorized to proceed elsewhere in the United States to sit, where necessary or proper, to discharge the duties of Congress toward District citizens.

However, it is contended that Congress may not combine this function, under Art. I, with those under Art. III, in district courts of the United States. Two objections are urged to this. One is that no jurisdiction other than specified in Art. III can be imposed on courts that exercise the judicial power of the United States thereunder. The other is that Art. I powers over the District of Columbia must be exercised solely within that geographic area.

Of course there are limits to the nature of duties which Congress may impose on the constitutional courts vested with the federal judicial power. The doctrine of separation of powers is fundamental in our system. It arises,

however, not from Art. III nor any other single provision of the Constitution, but because "behind the words of the constitutional provisions are postulates which limit and control." Chief Justice Hughes in *Monaco* v. *Mississippi*, 292 U. S. 313, 323. The permeative nature of this doctrine was early recognized during the Constitutional Convention. Objection that the present provision giving federal courts jurisdiction of cases arising "under this Constitution" would permit usurpation of nonjudicial functions by the federal courts was overruled as unwarranted since it was "generally supposed that the jurisdiction given was constructively limited to cases of a Judiciary nature." 2 Farrand, Records of the Federal Convention; 430. And this statute reflects that doctrine. It does not authorize or require either the district courts or this Court to participate in any legislative, administrative, political or other nonjudicial function or to render any advisory opinion. The jurisdiction conferred is limited to controversies of a justiciable nature, the sole feature distinguishing them from countless other controversies handled by the same courts being the fact that one party is a District citizen. Nor has the Congress by this statute attempted to usurp any judicial power. It has deliberately chosen the district courts as the appropriate instrumentality through which to exercise part of the judicial functions incidental to exertion of sovereignty over the District and its citizens.

Unless we are to deny to Congress the same choice of means through which to govern the District of Columbia that we have held it to have in exercising other legislative powers enumerated in the same Article, we cannot hold that Congress lacked the power it sought to exercise in the Act before us.

It is too late to hold that judicial functions incidental to Art. I powers of Congress cannot be conferred on

courts existing under Art. III, for it has been done with this Court's approval. *O'Donoghue* v. *United States,* 289 U. S. 516. In that case it was held that, although District of Columbia courts are Art. III courts, they can also exercise judicial power conferred by Congress pursuant to Art. I. The fact that District of Columbia courts, as local courts, can also be given administrative or legislative functions which other Art. III courts cannot exercise, does but emphasize the fact that, although the latter are limited to the exercise of judicial power, it may constitutionally be received from either Art. III or Art. I, and that congressional power over the District, flowing from Art. I, is plenary in every respect.

It is likewise too late to say that we should reach this result by overruling Chief Justice Marshall's view, unless we are prepared also to overrule much more, including some of our own very recent utterances. Many powers of Congress other than its power to govern Columbia require for their intelligent and discriminating exercise determination of controversies of a justiciable character. In no instance has this Court yet held that jurisdiction of such cases could not be placed in the regular federal courts that Congress has been authorized to ordain and establish. We turn to some analogous situations in which we have approved the very course that Congress has taken here.

Congress is given power by Art. I to pay debts of the United States. That involves as an incident the determination of disputed claims. We have held unanimously that congressional authority under Art. I, not the Art. III jurisdiction over suits to which the United States is a party, is the sole source of power to establish the Court of Claims and of the judicial power which that court exercises. *Williams* v. *United States,* 289 U. S. 553. In that decision we also noted that it is this same Art. I power that is conferred on district courts by the

Tucker Act[20] which authorizes them to hear and determine such claims in limited amounts. Since a legislative court such as the Court of Claims is "incapable of receiving" Art. III judicial power, *American Insurance Co.* v. *Canter*, 1 Pet. 511, 546, it is clear that the power thus exercised by that court and concurrently by the district courts flows from Art. I, not Art. III. Indeed, more recently and again unanimously, this Court has said that by the Tucker Act the Congress authorized the district courts to sit as a court of claims[21] exercising the same but no more judicial power. *United States* v. *Sherwood*, 312 U. S. 584, 591. And but a few terms ago, in considering an Act by which Congress directed rehearing of a rejected claim and its redetermination in conformity with directions given in the Act, Chief Justice Stone, with the concurrence of all sitting colleagues, reasoned that "The problem presented here is no different than if Congress had given a like direction to any district court to be followed as in other Tucker Act cases." *Pope* v. *United States*, 323 U. S. 1, 14. Congress has taken us at our word and recently conferred on the district courts exclusive jurisdiction of tort claims cognizable under the Federal Tort Claims Act, 60 Stat. 842, 843, also enacted

---

[20] Act of March 3, 1887, c. 359, 24 Stat. 505.

[21] This concurrent jurisdiction of the district courts has frequently been referred to in opinions of this Court with no indication that it presented any constitutional problem with respect to the jurisdiction of either the district courts or this Court. See, for example, *Pope* v. *United States*, 323 U. S. 1; *United States* v. *Sherwood*, 312 U. S. 584; *United States* v. *Shaw*, 309 U. S. 495; *Williams* v. *United States*, 289 U. S. 553; *Nassau Smelting Works* v. *United States*, 266 U. S. 101; *United States* v. *Pfitsch*, 256 U. S. 547; *Tempel* v. *United States*, 248 U. S. 121; *United States* v. *Greathouse*, 166 U. S. 601; *United States* v. *Jones*, 131 U. S. 1. The legislative basis for the grant of jurisdiction to the district courts is delineated in *Bates Mfg. Co.* v. *United States*, 303 U. S. 567.

pursuant to Art. I powers.[22] See *Brooks* v. *United States,* *ante,* p. 49.

Congress also is given power in Art. I to make uniform laws on the subject of bankruptcies. That this, and not the judicial power under Art. III, is the source of our system of reorganizations and bankruptcy is obvious, *Continental Bank* v. *Chicago, R. I. & P. R. Co.,* 294 U. S. 648. Not only may the district courts be required to handle these proceedings, but Congress may add to their jurisdiction cases between the trustee and others that, but for the bankruptcy powers, would be beyond their jurisdiction because of lack of diversity required under Art. III. *Schumacher* v. *Beeler,* 293 U. S. 367. In that case, Chief Justice Hughes for a unanimous court wrote that, by virtue of its Art. I authority over bankruptcies, the Congress could confer on the regular district courts jurisdiction of "all controversies at law and in equity, as distinguished from proceedings in bankruptcy, between trustees as such and adverse claimants" to the extent specified in § 23b of the Bankruptcy Act as amended. Such jurisdiction was there upheld in a plenary suit, in a district court, by which the trustee sought equitable relief rely-

---

[22] The suggestion here that claims against the United States, adjudicated by the Court of Claims and by the district courts solely by virtue of the waiver of sovereign immunity and the jurisdiction granted under the Tucker Act, may be cases arising "under the laws of the United States" is both erroneous and self-defeating. The unanimous decision in the *Williams* case, 289 U. S. 553, holds clearly to the contrary, stating, at 289 U. S. 577, that controversies to which the United States may by statute be made a party defendant "lie wholly outside the scope of the judicial power vested by Art. III . . . ." And see *Monaco* v. *Mississippi,* 292 U. S. 313, 321. Moreover, the Tucker Act simply opens those courts to plaintiffs already possessed of a cause of action. If that is sufficient to make the case one arising under the laws of the United States, the same is true of this suit and all others like it. No one urges that view of the present statute, nor could they. See note 23 and text.

ing on allegations raising only questions of Ohio law concerning the validity under that law of a sheriff's levy and execution. Possession by the trustee not being shown, and there being no divers ty, jurisdiction in the district court could flow only from the statute. Chief Justice Hughes noted that the distinction between proceedings in bankruptcy and suits at law and in equity was recognized by the terms of the statute itself, but held that "Congress, by virtue of its constitutional authority over bankruptcies, could confer or withhold jurisdiction to entertain such suits and could prescribe the conditions upon which the federal courts should have jurisdiction. . . . Exercising that power, the Congress prescribed in § 23b the condition of consent on the part of the defendant sued by the trustee. Section 23b was thus in effect a grant of jurisdiction subject to that condition." 293 U. S. 367, 374. He concluded that the statute granted jurisdiction to the district court "although the bankrupt could not have brought suit there if proceedings in bankruptcy had not been instituted . . . ." 293 U. S. 367, 377. And he stated the correct view to be that § 23 conferred substantive jurisdiction, 293 U. S. 367, 371, disapproving statements in an earlier case that Congress lacked power to confer such jurisdiction. *Id.* at 377. Thus, the Court held that Congress had power to authorize an Art. III court to entertain a non-Art. III suit because such judicial power was conferred under Art. I. Indeed, the present Court has assumed, without even discussion, that Congress has such power. In *Williams* v. *Austrian,* 331 U. S. 642, 657, the CHIEF JUSTICE, speaking for the Court, said that ". . . Congress intended by the elimination of § 23 [from Chapter X of the Bankruptcy Act] to establish the jurisdiction of federal courts to hear plenary suits brought by a reorganization trustee, *even though diversity or other usual ground for federal jurisdiction is lacking."* (Em-

phasis supplied.) There was vigorous dissent as to the meaning of the statute, but the dissenting Justices referred to the Court's holding that "a Chapter X trustee may bring this plenary suit *in personam* in a federal district court not the reorganization court, although neither diversity of citizenship nor other ground of federal jurisdiction exists." 331 U. S. 642, 664. And the dissent continued: "No doubt Congress could authorize such a suit. See *Schumacher* v. *Beeler*, 293 U. S. 367, 374." *Ibid.*

This assumption by the Court in the *Beeler* and *Austrian* cases, that the Congress had power to confer on the district courts jurisdiction of nondiversity suits involving only state law questions, made unnecessary any discussion of the source of the assumed power. In view of Congress' plenary control over bankruptcies, the Court may have grounded such assumption on Art. I. Or it might have considered that the jurisdiction was based on Art. III, and statutes enacted pursuant to it, giving the district courts jurisdiction over suits arising under the Constitution and laws of the United States. Had the Court held such a view, this latter might have commended itself as the most obvious answer. Consequently, silence in this respect, in the decision of each case, seems significant, particularly in contrast with repeated reference to Art. I power in the *Beeler* case, and sweeping language in the *Austrian* case that such jurisdiction existed despite lack of diversity "or other usual ground for federal jurisdiction." Nevertheless, it is now asserted, in retrospect, that those cases did arise under the laws of the United States. No justification is offered for that conclusion and there is no effort to say just why or how the cases did so arise. This would indeed be difficult if we still adhere to the doctrine of Mr. Justice Holmes that "a suit arises under the law that creates the cause

of action," *American Well Works Co.* v. *Layne Co.*, 241 U. S. 257, 260, for the cause of action in each case rested solely on state law.

But the matter does not rest on inference alone. Other decisions of this Court demonstrate conclusively that jurisdiction over the *Beeler* and *Austrian* suits was not and could not have been conferred under Art. III and statutes concerning suits arising under the laws of the United States. A most thoroughly-considered utterance of this Court on that subject was given by Mr. Justice Cardozo, in *Gully* v. *First National Bank,* 299 U. S. 109, where he said, without dissent, "How and when a case arises 'under the Constitution or laws of the United States' has been much considered in the books. Some tests are well established. To bring a case within the statute, a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's *cause of action.* . . . [Emphasis added.] The right or immunity must be such that it will be supported if the Constitution or laws of the United States are given one construction or effect, and defeated if they receive another. . . . A genuine and present controversy, not merely a possible or conjectural one, must exist with reference thereto . . . and the controversy must be disclosed upon the face of the complaint . . . ." 299 U. S. 109, 112–113. After reviewing previous cases, Mr. Justice Cardozo referred to a then recent opinion by Mr. Justice Stone in which he said, for a unanimous court, that federal jurisdiction "may not be invoked where the right asserted is non-federal, merely because the plaintiff's right to sue is derived from federal law, or because the property involved was obtained under federal statute. *The federal nature of the right to be established is decisive—not the source of the authority to establish it."* *Puerto Rico* v. *Russell & Co.,* 288 U. S.

476, 483. (Emphasis added.)[23] See also *Switchmen's Union* v. *Board,* 320 U. S. 297; *General Committee* v. *M.-K.-T. R. Co.,* 320 U. S. 323.

Neither the *Austrian* nor the *Beeler* case meets these tests, required before a case can be said to arise under the laws of the United States, any more than does the case before us. Austrian, as trustee, sued in equity for an accounting based on a charge that affairs of a state-created corporation had been conducted by the officers in violation of state law. Beeler, as trustee, sued on a contention that a levy on property by an Ohio sheriff was void under state law. Both controversies, like the one before·

---

[23] The books are replete with authority on this point. For example, in *Shoshone Mining Co.* v. *Rutter,* 177 U. S. 505, it was said, at p. 507: "The suit must, in part at least, arise out of a controversy between the parties in regard to the operation and effect of the Constitution or laws upon the facts involved. . . ." And at p. 513: ". . . the mere fact that a suit is an adverse suit authorized by the statutes of Congress is not in and of itself sufficient to vest jurisdiction in the Federal courts." And again at p. 507 it is considered "well settled that a suit to enforce a right which takes its origin in the laws of the United States is not necessarily one arising under the Constitution or laws of the United States . . . ." In *Bankers Casualty Co.* v. *Minneapolis, St. P. & S. S. M. R. Co.,* 192 U. S. 371, at p. 384: ". . . suits though involving the Constitution or laws of the United States are not suits arising under the Constitution or laws where they do not turn on a controversy between the parties in regard to the operation of the Constitution or laws, on the facts. . . ." And at p. 385: "We repeat that the rule is settled that a case does not arise under the Constitution or laws of the United States unless it appears from plaintiff's own statement, in the outset, that some title, right, privilege or immunity on which recovery depends will be defeated by one construction of the Constitution or laws of the United States, or sustained by the opposite construction." In *Louisville & Nashville R. Co.* v. *Mottley,* 211 U. S. 149, 152, allegations designed to establish that the case arises under the Constitution are said to be insufficient if they do not show that "the suit, that is, the plaintiff's original cause of action," does so arise.

us, called for a determination of no law question except those arising under state laws. The only way in which any law of the United States contributed to the case was in opening the district courts to the trustee, under Art. I powers of Congress, just as the present statute, under the same Article, opens those courts to residents of the District of Columbia. In each case, in the words of Chief Justice Stone, the federal law provided, not the right sought to be established, but only the authority of the trustee to establish it. The fact that the congressional power over bankruptcy granted by Art. I could open the court to the trustee does not mean that such suits arise under the laws of the United States; but it does mean that Art. I can supply a source of judicial power for their adjudication. The distinction is important and it is decisive on this issue.

Neither the *Beeler* nor the *Austrian* case was one arising under the laws of the United States within the clear language of recent holdings by this Court. Unless we are to deny the jurisdiction in such cases which has consistently been upheld, we must rely on the Art. I powers of the Congress. We have been cited to no holding that such jurisdiction cannot spring from that Article. Under Art. I the Congress has given the district courts not only jurisdiction over cases arising under the bankruptcy law but also judicial power over nondiversity cases which do not arise under that or any other federal law. And this Court has upheld the latter grant.

Consequently, we can deny validity to this present Act of Congress, only by saying that the power over the District given by Art. I is somehow less ample than that over bankruptcy given by the same Article. If Congress could require this district court to decide this very case if it were brought by a trustee, it is hard to see why it may not require its decision for a solvent claimant when done in pursuance of other Art. I powers.

We conclude that where Congress in the exercise of its powers under Art. I finds it necessary to provide those on whom its power is exerted with access to some kind of court or tribunal for determination of controversies that are within the traditional concept of the justiciable, it may open the regular federal courts to them regardless of lack of diversity of citizenship. The basis of the holdings we have discussed is that, when Congress deems that for such purposes it owes a forum to claimants and trustees, it may execute its power in this manner. The Congress, with equal justification, apparently considers that it also owes such a forum to the residents of the District of Columbia in execution of its power and duty under the same Article. We do not see how the one could be sustained and the other denied.

We therefore hold that Congress may exert its power to govern the District of Columbia by imposing the judicial function of adjudicating justiciable controversies on the regular federal courts [24] which under the Constitution it has the power to ordain and establish and which it may invest with jurisdiction and from which it may withhold jurisdiction "in the exact degrees and character which to Congress may seem proper for the public good." *Lock-erty.v. Phillips,* 319 U. S. 182, 187.

The argument that congressional powers over the District are not to be exercised outside of its territorial limits also is pressed upon us. But this same contention has long been held by this Court to be untenable. In *Cohens*

[24] No question has been raised here as to the source of this Court's appellate jurisdiction over such cases. Nor do we see how that issue could be raised without challenging our past and present exercise of jurisdiction over cases adjudicated in the district courts and in the Court of Claims, solely under the Tucker Act, see *Pope* v. *United States,* 323 U. S. 1, 13–14, and see notes 21, 22; and under the Federal Tort Claims Act, see *Brooks* v. *United States, ante,* p. 49.

v. *Virginia*, 6 Wheat. 264, 425, 429, Chief Justice Marshall, answering the argument that Congress, when legislating for the District, "was reduced to a mere local legislature, whose laws could possess no obligation out of the ten miles square," said "Congress is not a local legislature, but exercises this particular power, like all its other powers, in its high character, as the legislature of the Union. The American people thought it a necessary power, and they conferred it for their own benefit. Being so conferred, it carries with it all those incidental powers which are necessary to its complete and effectual execution." In *O'Donoghue* v. *United States*, 289 U. S. 516, 539, this Court approved a statement made by Circuit Judge Taft, later Chief Justice of this Court, speaking for himself and Judge (later Mr. Justice) Lurton, that "The object of the grant of exclusive legislation over the district was, therefore, national in the highest sense, and the city organized under the grant became the city, not of a state, not of a district, but of a nation. In the same article which granted the powers of exclusive legislation over its seat of government are conferred all the other great powers which make the nation, including the power to borrow money on the credit of the United States. He would be a strict constructionist, indeed, who should deny to congress the exercise of this latter power in furtherance of that of organizing and maintaining a proper local government at the seat of government. Each is for a national purpose, and the one may be used in aid of the other. . . ." And, just prior to enactment of the statute now challenged on this ground, the Court of Appeals for the District itself, sitting *en banc,* and relying on the foregoing authorities, had said that Congress "possesses full and unlimited jurisdiction to provide for the general welfare" of District citizens "by any and every act of legislation which it may deem conducive to that end . . .

when it legislates for the District, Congress acts as a legislature of national character, exercising complete legislative control as contrasted with the limited power of a state legislature, on the one hand, and as contrasted with the limited sovereignty which Congress exercises within the boundaries of the states, on the other." *Neild* v. *District of Columbia,* 71 App. D. C. 306, 310, 110 F. 2d 246, 250.

We could not of course countenance any exercise of this plenary power either within or without the District if it were such as to draw into congressional control subjects over which there has been no delegation of power to the Federal Government. But, as we have pointed out, the power to make this defendant suable by a District citizen is not claimed to be outside of federal competence. If Congress has power to bring the defendant from his home all the way to a forum within the District, there seems little basis for denying it power to require him to meet the plaintiff part way in another forum. The practical issue here is whether, if defendant is to be suable at all by District citizens, he must be compelled to come to the courts of the District of Columbia or perhaps to a special statutory court sitting outside of it, or whether Congress may authorize the regular federal courts to entertain the suit. We see no justification for holding that Congress in accomplishing an end admittedly within its power is restricted to those means which are most cumbersome and burdensome to a defendant. Since it may provide the District citizen with a federal forum in which to sue the citizens of one of the states, it is hard to imagine a fairer or less prejudiced one than the regular federal courts sitting in the defendant's own state. To vest the jurisdiction in them rather than in courts sitting in the District of Columbia would seem less harsh to defendants and more consistent with the principles of venue that prevail in our system

under which defendants are generally suable in their home forums.

.The Act before us, as we see it, is not a resort by Congress to these means to reach forbidden ends. Rather, Congress is reaching permissible ends by a choice of means which certainly are not expressly forbidden by the Constitution. No good reason is advanced for the Court to deny them by implication. In no matter should we pay more deference to the opinions of Congress than in its choice of instrumentalities to perform a function that is within its power.[25] To put federally administered justice within the reach of District citizens, in claims against citizens of another state, is an object which Congress has a right to accomplish. Its own carefully considered view that it has the power and that it is necessary and proper to utilize United States District Courts as means to this end, is entitled to great respect. Our own ideas as to the wisdom or desirability of such a statute or the constitutional provision authorizing it are totally irrelevant. Such a law of Congress should be stricken down

---

[25] Chief Justice Marshall, in *McCulloch* v. *Maryland,* 4 Wheat. 316, 420–421, said: "The result of the most careful and attentive consideration bestowed upon this [the 'necessary and proper'] clause is, that if it does not enlarge, it cannot be construed to restrain the powers of Congress, or to impair the right of the legislature to exercise its best judgment in the selection of measures to carry into execution the constitutional powers of the government. . . . We admit, as all must admit, that the powers of the government are limited, and that its limits are not to be transcended. But we think the sound construction of the constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."

only on a clear showing that it transgresses constitutional limitations. We think no such showing has been made.[26] The Act is valid.

The judgment is

*Reversed.*

MR. JUSTICE RUTLEDGE, with whom MR. JUSTICE MURPHY agrees, concurring.

I join in the Court's judgment. But I strongly dissent from the reasons assigned to support it in the opinion of MR. JUSTICE JACKSON.

While giving lip service to the venerable decision in *Hepburn & Dundas* v. *Ellzey,* 2 Cranch 445, and purporting to distinguish it, that opinion ignores nearly a century and a half of subsequent consistent construction.[1] In all practical consequence, it would overrule that decision with its later reaffirmations. Pertinently it may be asked, how and where are those decisions to operate, if not just in the situation presented by this case? And, if there is no other, would they not be effectively overruled?

What is far worse and more important, the manner in which this reversal would be made, if adhered to by a majority of the Court, would entangle every district court of the United States for the first time in all of the contradictions, complexities and subtleties which have

---

[26] It would not be profitable to review the numerous cases in which, during the consideration of other problems, this Court has made statements concerning the nature and extent of Congress' power to legislate for the District of Columbia and its control over the jurisdiction of both constitutional and legislative courts. The issue now presented squarely for decision was not decided in any of them. We adhere to Chief Justice Marshall's admonition in *Cohens* v. *Virginia,* 6 Wheat. 264, 399, that such expressions "ought not to control the judgment in a subsequent suit when the very point is presented for decision."

[1] See notes 3 and 4 and text *infra.*

surrounded the courts of the District of Columbia in the maze woven by the "legislative court—constitutional court" controversy running through this Court's decisions concerning them.[2]

In my opinion it would be better to continue following what I conceive to be the original error of the *Hepburn* decision and its progeny than thus to ensnarl the general system of federal courts. Jurisdictional and doctrinal troubles enough we have concerning them without adding others by ruling now that they have the origin and jurisdiction of "legislative" courts in addition to that of "constitutional" courts created under Article III, with which alone they heretofore have been held endowed.

Moreover, however this case may be decided, there is no real escape from deciding what the word "State" as used in Article III, § 2 of the Constitution means. For if it is a limitation on Congress' power as to courts created under that Article, it is hard to see how it becomes no limitation when Congress decides to cast it off under some other Article, even one relating to its authority over the District of Columbia. If this may be done in the name of practical convenience and dual authority, or because Congress might find some other constitutional way to make citizens of the District suable elsewhere or to bring here for suit citizens from any part of the country, then what is a limitation imposed on the federal courts generally is none when Congress decides to disregard it by purporting to act under some other authorization.

The Constitution is not so self-contradictory. Nor are its limitations to be so easily evaded. The very essence of the problem is whether the Constitution meant to cut out from the diversity jurisdiction of courts created under Article III suits brought by or against citizens of the

---

[2] See text *infra* and authorities cited at notes 7–9.

District of Columbia. That question is not answered by saying in one breath that it did and in the next that it did not.

## I.

Prior to enactment of the 1940 statute today considered, federal courts of the District of Columbia were the only federal courts which had jurisdiction to try nonfederal civil actions between citizens of the District and citizens of the several states. The doors of federal courts in every state, open to suits between parties of diverse state citizenship by virtue of Article III, § 2 (as implemented by continuous congressional enactment), were closed to citizens of the District of Columbia. The 1940 statute was Congress' first express attempt to remedy the inequality which has obtained ever since Chief Justice Marshall, in *Hepburn & Dundas* v. *Ellzey, supra,* construed the first Judiciary Act to exclude citizens of the District of Columbia. Marshall's construction of the 1789 statute was founded on his conclusion that the comparable language of the diversity clause in Article III, § 2—"Citizens of different States"—did not embrace citizens of the District.

Marshall's view of the 1789 Act, iterated in his later dictum, *New Orleans* v. *Winter,* 1 Wheat. 91, 94; cf. *Sere* v. *Pitot,* 6 Cranch 332, 336, has been consistently adhered to in judicial interpretation of later congressional grants of jurisdiction.[3] And, by accretion, the rule of the *Hepburn* case has acquired the force of a considered determination that, within the meaning of Article III, § 2, "the District of Columbia is not a State"[4] and its citizens are therefore not citizens of any state within that Article's meaning.

---

[3] *Barney* v. *Baltimore,* 6 Wall. 280; *Hooe* v. *Jamieson,* 166 U. S. 395; *Hooe* v. *Werner,* 166 U. S. 399.

[4] *Hooe* v. *Jamieson,* 166 U. S. 395, 397; cf. *Downes* v. *Bidwell,* 182 U. S. 244, 270.

The opinion of MR. JUSTICE JACKSON in words "reaffirms" this view of the diversity clause. Nevertheless, faced with an explicit congressional command to extend jurisdiction in nonfederal cases to the citizens of the District of Columbia, it finds that Congress has power to add to the Article III jurisdiction of federal district courts such further jurisdiction as Congress may think "necessary and proper," Const., Art. I, § 8, cl. 18, to implement its power of "exclusive Legislation," Const., Art. I, § 8, cl. 17, over the District of Columbia; and thereby to escape from the limitations of Article III.

From this reasoning I dissent. For I think that the Article III courts in the several states cannot be vested, by virtue of other provisions of the Constitution, with powers specifically denied them by the terms of Article III. If we accept the elementary doctrine that the words of Article III are not self-exercising grants of jurisdiction to the inferior federal courts,[5] then I think those words must mark the limits of the power Congress may confer on the district courts in the several states. And I do not think we or Congress can override those limits through invocation of Article I without making the Constitution a self-contradicting instrument. If Marshall correctly read Article III as preventing Congress from unlocking

---

[5] "Of all the Courts which the United States may, under their general powers, constitute, one only, the Supreme Court, possesses jurisdiction derived immediately from the constitution, and of which the legislative power cannot deprive it." *United States* v. *Hudson*, 7 Cranch 32, 33. And see Justice Chase's remarks in *Turner* v. *Bank of North America*, 4 Dall. 8, 10, n. 1. But cf. *Martin* v. *Hunter's Lessee*, 1 Wheat. 304, 328–331. For recent reaffirmation of the prevailing view see *Kline* v. *Burke Construction Co.*, 260 U. S. 226, 233–234. And see the comprehensive survey of congressional power over the jurisdiction of federal courts prepared for the Judiciary Committee of the House of Representatives by MR. JUSTICE FRANKFURTER before his accession to this bench. F R. Rep. No. 669, 72d Cong., 1st Sess. 12–14

the courthouse door to citizens of the District, it seems past belief that Article I was designed to enable Congress to pick the lock. For the diversity jurisdiction here thus sustained is identical in all respects with the diversity jurisdiction thought to be closed to District citizens by Article III: It is justice administered in the same courtroom and under the supervision of the same judge; it is, presumptively, justice fashioned by the Federal Rules of Civil Procedure and, now, under the aegis of *Erie R. Co.* v. *Tompkins.*[6] The jurisdiction today thus upheld is not simply an expurgated version of a banned original; it is the real thing.

To circumvent the limits of Article III, it is said, after finding a contrary and overriding intent in Article I, that Article III district courts in the several states can also be vested with jurisdiction springing from Article I. The only express holding which conceivably could lend comfort to this doctrine of dual jurisdiction is this Court's conclusion in *O'Donoghue* v. *United States,* 289 U. S. 516, that certain courts of the District of Columbia, theretofore deemed legislative courts created under Article I,[7] owe their jurisdiction to Article I and

---

[6] 304 U. S. 64. If it were assumed that the Constitution requires the application of local law in traditional diversity suits (cf. *id.* at 77–80; *Black & White Taxicab Co.* v. *Brown & Yellow Taxicab Co.,* 276 U. S. 518, dissenting opinion at 533; but cf. *Cohen* v. *Industrial Loan Corp., post* at 541, dissenting opinion at 557), it may be wondered whether that requirement would also govern the rationale of jurisdiction today advanced: Under this rationale, Congress might well find in Article I power to authorize articulation of a body of federal substantive law for the decision of diversity cases involving citizens of the District of Columbia.

[7] *Federal Radio Commission* v. *General Electric Co.,* 281 U. S. 464; *Postum Cereal Co.* v. *California Fig Nut Co.,* 272 U. S. 693; *Keller* v. *Potomac Electric Co.,* 261 U. S. 428. Cf. *Ex parte Bakelite Corp.,* 279 U. S. 438, 450; *Federal Radio Commission* v. *Nelson Bros.,* 289 U. S. 266, 274–276; *United States* v. *Jones,* 336 U. S. 641, 652, n. 12.

Article III. With the merits of the *O'Donoghue* decision in holding that Article III barred salary reductions for judges of the courts in question, we are not presently concerned. Suffice it to point out that the express language of the *O'Donoghue* decision negatives the view that federal courts in the several states share this hybrid heritage:

> ". . . Congress derives from the District clause distinct powers in respect of the constitutional courts of the District which Congress does not possess in respect of such courts outside the District." [8]

The limits of the *O'Donoghue* decision are only underscored by the dissenting view of Chief Justice Hughes and Justices Van Devanter and Cardozo that all District of Columbia courts are solely the creatures of Article I:

> "As the courts of the District do not rest for their creation on § 1 of Article III, their creation is not subject to any of the limitations of that provision. Nor would those limitations, if considered to be applicable, be susceptible of division so that some might be deemed obligatory and others might be ignored." 289 U. S. at 552.

Comfort is sought to be drawn, however, from this Court's rationale in *Williams* v. *United States*, 289 U. S. 553, which, in sanctioning salary reductions for judges of the Court of Claims, held that that court did not derive its jurisdiction from Article III. That conclusion stemmed in part from the proposition that suits *against* the United States are not "Controversies to which the United States shall be a Party," within the meaning of Article III, § 2. Hence, it is said, the permissible inference is that the long-established concurrent jurisdiction of district courts over claims against the United States

---

[8] *O'Donoghue* v. *United States*, 289 U. S. 516, 551. Cf. *Pitts* v. *Peak*, 60 App. D. C. 195, 197.

is likewise not derived from Article III.[9] We need not today determine the nature of district court jurisdiction of suits against the United States. Suffice it to say that, if such suits are not "Controversies to which the United States shall be a Party," they are presumptively within the purview of the federal-question jurisdiction to which MR. JUSTICE FRANKFURTER's opinion directs our attention—the Article III, § 2 grant of power over "Cases . . . arising under . . . the Laws of the United States." This is, at least, the conventional view of district court jurisdiction under the Tucker Act. 2 Moore, Federal Practice (2d ed., 1948) 1633.

But, in any event, to rely on *Williams* as dispositive of the present case is to rely on a bending reed: *Williams* and *O'Donoghue* were companion cases, argued together and decided together; and the opinions were written by the same Justice. Accordingly, what was said in one must be read in the light of what was said in the other. *O'Donoghue,* as has been observed, expressly rejected the proposition today announced—that Congress can vest in constitutional courts outside the District of Columbia jurisdiction derived from the District clause of Article I.

But *O'Donoghue* went further, and in so doing undermined any implication in *Williams* that Article III courts outside the District could be vested with any form of non-Article III jurisdiction, when it pointed out that no courts of the District of Columbia could be granted "administrative and other jurisdiction," if, "in creating and defining the jurisdiction of the courts of the District, Congress were limited to Art. III, as it is in dealing with the other federal courts . . . ." 289 U. S. at 546. Moreover, the Justices who dissented from the *O'Donoghue* rationale of dual jurisdiction expressed no disagreement with the *Williams* opinion. In these circumstances, cer-

---

[9] See Comments, 43 Yale L. J. 316, 319 (1933).

tainly no more strength can be drawn from the language of a case upholding salary reductions for one group of judges than from the holding in a case striking down salary reductions for another group of judges.

Nor is there merit in the view that the bankruptcy jurisdiction of district courts does not stem from Article III. Of course it is true that Article I is the source of *congressional* power over bankruptcy, as it is the source of *congressional* power over interstate commerce, taxation, the coining of money, and other powers confided by the states to the exclusive exercise of the national legislature. But, as MR. JUSTICE FRANKFURTER's opinion makes clear, federal court adjudication of disputes arising pursuant to bankruptcy and other legislation is conventional federal-question jurisdiction. And no case cited in any of today's opinions remotely suggests the contrary.

Furthermore, no case cited supports the view that jurisdiction over a suit to collect estate assets under § 23 (b) of the Bankruptcy Act, brought by the trustee in a district court with the "consent" of the defendant, is a departure from the general rule and is derived from Article I alone. To be sure, although this Court indicated a contrary view in the early case of *Lovell* v. *Newman & Son,* 227 U. S. 412, 426, Chief Justice Hughes' opinion in *Schumacher* v. *Beeler,* 293 U. S. 367, made it perfectly clear that district courts can, with the consent of the proposed defendant, entertain trustee suits under. § 23 (b) which the bankrupt, *but for the Bankruptcy Act,* could not have prosecuted in a federal court absent diversity or some independent federal question "arising under . . . the Laws of the United States." The opinion stated:

"Conflicting views have been held of the meaning of the provision for consent in § 23 (b). In one view, the provision relates merely to venue, that is, only to a consent to the 'local jurisdiction.' . . .

The opposing view was set forth by the court below in *Toledo Fence & Post Co.* v. *Lyons,* 290 Fed. 637, 645, and that decision was followed in the instant case. . . . It proceeds upon the ground that the Congress had power to permit suits by trustees in bankruptcy in the federal courts against adverse claimants, regardless of diversity of citizenship, and that by § 23 (b) the Congress intended that the federal courts should have that jurisdiction in cases where the defendant gave consent, and, without that consent, in cases which fell within the stated exceptions.

"We think that the latter view is the correct one." 293 U. S. at 371.

Chief Justice Hughes' opinion does not intimate that this "consent jurisdiction" arises solely from Article I. Quite the contrary, the opinion by Judge Denison outlining the "view" which the Chief Justice described as "the correct one" expressly stated that such suits are a segment of the district court's federal-question jurisdiction:

"The trustee must allege and prove that valid proceedings were taken under the Bankruptcy Act, leading to a valid adjudication, whereby title passed, and that by valid proceedings under the act he was chosen as trustee. If the proof fails in any of these particulars, the suit fails. The suit is one step in the collection of assets in the execution of the Bankruptcy Act. That such a case would be one 'arising under the laws of the United States' we think is the result of well-settled principles. It will be observed that under the constitutional limitations of the federal judicial power (article 3, sec. 2), and with exceptions not to this question important, Congress has no power to confer jurisdiction on the inferior federal courts excepting as to suits which do so arise; and every decision which upholds the right to sue in the

federal court by one who merely acquires title through the operation of a federal law is therefore, by necessary implication, a holding that such a suit 'arises under' federal laws." *Toledo Fence & Post Co.* v. *Lyons,* 290 F. 637, 641; and cf. *Beeler* v. *Schumacher,* 71 F. 2d 831, 833.

There seems no reason therefore to suppose that this Court, in holding "correct" the view that district courts have jurisdiction over a trustee suit which could not have been brought by the bankrupt, rejected the explicit Article III basis of that jurisdiction.

And neither reliance on *Gully* v. *First National Bank,* 299 U. S. 109; *Puerto Rico* v. *Russell & Co.,* 288 U. S. 476, and related cases, nor the suggestion that "a suit arises under the law that creates the cause of action," *American Well Works* v. *Layne,* 241 U. S. 257, 260, compels the conclusion that Congress could not and did not classify § 23 (b) suits to collect estate assets as federal-question cases arising under the Bankruptcy Act. As this Court has had occasion to observe, a " 'cause of action' may mean one thing for one purpose and something different for another." *United States* v. *Memphis Cotton Oil Co.,* 288 U. S. 62, 67–68; and see *Gully* v. *First National Bank, supra,* at 117. Similarly, as students of federal jurisdiction have taken pains to point out, the "substantial identity of the words" in the *constitutional* and *statutory* grants of federal-question jurisdiction, "does not, of course, require, on that score alone, an identical interpretation." Shulman and Jaegerman, Some Jurisdictional Limitations on Federal Procedure, 45 Yale L. J. 393, 405, n. 47 (1936). Confusion of the two is a natural, but not an insurmountable, hazard. The *Gully* and *Puerto Rico* cases were concerned with the general statutory grant to district courts of jurisdiction over federal questions; they were not concerned with the constitutional grant of jurisdiction, nor with the specific

statutory grant of jurisdiction found in the Bankruptcy Act and approved in *Schumacher* v. *Beeler, supra.*

It has never heretofore been doubted that the constitutional grant of power is broader than the general federal-question jurisdiction which Congress has from time to time thought to confer on district courts by statute. In one of the federal land-grant cases relied on in MR. JUSTICE JACKSON's opinion, this Court had occasion to make this distinction clear:

> "By the Constitution (art. 3, sec. 2) the judicial power of the United States extends 'to all cases, in law and equity, arising under this Constitution, the laws of the United States' and to controversies 'between citizens of different States.' By article 4, s. 3, cl. 2, Congress is given 'power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States.' Under these clauses Congress might doubtless provide that any controversy of a judicial nature arising in or growing out of the disposal of the public lands should be litigated only in the courts of the United States. The question, therefore, is not one of the power of Congress, but of its intent. It has so constructed the judicial system of the United States that the great bulk of litigation respecting rights of property, although those rights may in their inception go back to some law of the United States, is in fact carried on in the courts of the several States." *Shoshone Mining Company* v. *Rutter,* 177 U. S. 505, 506.

Indeed, were we to adopt the view that the *Gully* rule is a test applicable to the *constitutional* phrase, we would effectively repudiate Chief Justice Marshall's conclusion in *Osborn* v. *Bank of the United States,* 9 Wheat. 738, that Congress can allow a federally chartered corporation to bring all its litigation into federal courts

for the reason that, solely by virtue of the corporation's federal origin, all suits to which the corporation is a party are suits "arising under . . . the Laws of the United States" within the meaning of Article III. The rule of the *Bank of the United States* case, reiterated in *The Pacific Railroad Removal Cases,* 115 U. S. 1; *Matter of Dunn,* 212 U. S. 374; *American Bank & Trust Co.* v. *Federal Bank,* 256 U. S. 350; *Sowell* v. *Federal Reserve Bank,* 268 U. S. 449; and *Federal Bank* v. *Mitchell,* 277 U. S. 213, has been limited by statute but never by subsequent constitutional construction. The survival of the rule was acknowledged by Mr. Justice Stone in *Puerto Rico* v. *Russell & Co., supra* at 485, and by Mr. Justice Cardozo in *Gully* v. *First National Bank, supra,* at 114.

In short, Congress has at no time conferred on federal district courts original jurisdiction over all federal questions, preferring to leave trial of many and perhaps most such questions to state adjudication, subject to the ultimate review of this Court. But exceptions to the congressional policy of limitation there have been, and one of these is the trustee suit under § 23 (b). 2 Moore, Federal Practice (2d ed., 1948) 1633.

Thus I see no warrant for gymnastic expansion of the jurisdiction of federal courts outside the District. At least as to these latter courts sitting in the states, I have thought it plain that Article III described and defined their "judicial Power," and that where "power proposed to be conferred . . . was not judicial power within the meaning of the Constitution . . . [it] was, therefore, unconstitutional, and could not lawfully be exercised by the courts." [10]

---

[10] Note by Chief Justice Taney inserted by order of the Court after the opinion in *United States* v. *Ferreira,* 13 How. 40, 53, summarizing the Court's conclusions in *Hayburn's Case,* 2 Dall. 409, and *United States* v. *Yale Todd,* decided without opinion by this Court on February 17, 1794, and apparently unreported.

If Article III were no longer to serve as the criterion of district court jurisdiction, I should be at a loss to understand what tasks, within the constitutional competence of Congress, might not be assigned to district courts. At all events, intimations that district courts could only undertake the determination of "justiciable" controversies seem inappropriate, since the very clause of Article I today relied on has long been regarded as the source of the "legislative," *Keller* v. *Potomac Electric Co.,* 261 U. S. 428, and "administrative," *Postum Cereal Co.* v. *California Fig Nut Co.,* 272 U. S. 693, powers of the courts of the District of Columbia. Moreover, the suggestion that the Constitutional Convention recognized a constructive limitation of federal jurisdiction to "cases of a Judiciary nature," II Farrand, Records of the Federal Convention 430–431, merely lays bare the ultimate fallacy underlying rejection of the boundaries of Article III. For the constructive limitation referred to in the Convention debates is a limitation imposed by Article III, and the opinion of MR. JUSTICE JACKSON by hypothesis denies that Article III expresses the full measure of power which can be delegated to federal district courts. If district courts are—as I agree they are—confined to "cases of a Judiciary nature," then too they are confined to cases "between Citizens of different States," except insofar as other Article III provisions expand the potential grant of jurisdiction. For—to borrow the words of the *O'Donoghue* dissent—the limitations of Article III, "if considered to be applicable, [would not] be susceptible of division so that some might be deemed obligatory and others might be ignored." 289 U. S. at 552.

In view of the rationale adopted by MR. JUSTICE JACKSON's opinion, I do not understand the necessity for its examination of the limits of the diversity clause of Article III. That opinion has, however, made clear the view that the diversity clause excludes citizens of the

District of Columbia, although where that view may now be applied it does not point out. If I concurred in that conception of the diversity clause I would vote to affirm the judgment of the Court of Appeals.

## II.

However, nothing but naked precedent, the great age of the *Hepburn* ruling, and the prestige of Marshall's name, supports such a result. It is doubtful whether anyone could be found who now would write into the Constitution such an unjust and discriminatory exclusion of District citizens from the federal courts. All of the reasons of justice, convenience, and practicality which have been set forth for allowing District citizens a furtive access to federal courts, point to the conclusion that they should enter freely and fully as other citizens and even aliens do.

Precedent of course is not lightly to be disregarded, even in the greater fluidity of decision which the process of constitutional adjudication concededly affords.[11] And

---

[11] Cf. *Screws* v. *United States*, 325 U. S. 91, 112–113. See the trenchant discussion by Mr. Justice Brandeis of the lesser impact of *stare decisis* in the realm of constitutional construction, *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393, 405–410 (dissenting opinion), and the views of MR. JUSTICE FRANKFURTER dissenting in *Commissioner* v. *Estate of Church*, 335 U. S. 632, 676–677. Instances in which this Court has overruled prior constitutional determinations are catalogued in *Burnet* v. *Coronado Oil & Gas Co.*, supra at 407, n. 2, 409, n. 4, and in *Helvering* v. *Griffiths*, 318 U. S. 371, 401, n. 52; compare Mr. Justice Brandeis' compilations in *Burnet* v. *Coronado Oil & Gas Co.*, supra at 406, n. 1, and in his dissenting opinion in *Washington* v. *Dawson & Co.*, 264 U. S. 219, 238, n. 21. Chief Justice Stone, speaking for the Court on the death of Mr. Justice Brandeis, took occasion to note the prime role played by the latter in liberating the Court from mechanical adherence to precedent where constitutional issues are at stake: "He never lost sight of the fact that the Constitution is primarily a great charter of government, and often repeated Marshall's words: 'it is *a constitution* we are expounding' 'intended to endure for ages to come, and, consequently, to be adapted to the various crises

618

Marshall's sponsorship in such matters always is weighty. But when long experience has disclosed the fallacy of a ruling, time has shown its injustice, and nothing remains but a technicality the only effect of which is to perpetuate inequity, hardship and wrong, those are the circumstances which this Court repeatedly has said call for reexamination of prior decisions. If those conditions are fulfilled in any case, they are in this one.

The *Hepburn* decision was made before time, through later decisions here, had destroyed its basic premise and at the beginning of Marshall's judicial career, when he had hardly started upon his great work of expounding the Constitution. The very brevity of the opinion and its groundings, especially in their ambiguity, show that the master hand which later made his work immortal faltered.[12]

---

of human affairs.' Hence, its provisions were to be read not with the narrow literalism of a municipal code or a penal statute, but so that its high purposes should illumine every sentence and phrase of the document and be given effect as a part of a harmonious framework of government. Notwithstanding the doctrine of *stare decisis*, judicial interpretations of the Constitution, since they were beyond legislative correction, could not be taken as the final word. They were open to reconsideration, in the light of new experience and greater knowledge and wisdom." 317 U. S. xlii, xlvii.

[12] The *Hepburn* case was not the only one in those earlier years where the master touch was lacking. Cf. *Bank of the United States v. Deveaux*, 5 Cranch 61; *Hope Insurance Co. v. Boardman*, 5 Cranch 57; *Maryland Insurance Co. v. Woods*, 6 Cranch 29, 7 Cranch 402; McGovney, A Supreme Court Fiction, 56 Harv. L. Rev. 853, 863–885 (1943). See particularly the discussion at 876–883. By positing the capacity of a corporation to sue or be sued under the diversity clause on the citizenship of its shareholders, the *Deveaux* decision opened the way for corporations ultimately to be brought within the diversity jurisdiction, but only by the long and tortuous evolution of the law through the stages first of rebuttable and finally of conclusive presumption (now most often contrary to the fact) that all the shareholders are citizens of the state of incorporation. See *Louisville, C. & C. R. Co. v. Letson*, 2 How. 497.

The sole reason Marshall assigned for the decision was "a conviction that the members of the American confederacy only are the states contemplated in the constitution," a conviction resulting as he said from an examination of the use of that word in the charter to determine "whether Columbia is a state in the sense of that instrument." 2 Cranch at 452. "When the same term which has been used plainly in this limited sense [as designating a member of the union] in the articles respecting the legislative and executive departments, is also employed in that which respects the judicial department, it must be understood as retaining the sense originally given to it." *Ibid.*

This narrow and literal reading was grounded exclusively on three constitutional provisions: the requirements that members of the House of Representatives be chosen by the people of the several states; that the Senate shall be composed of two Senators from each state; and that each state "shall appoint, for the election of the executive," the specified number of electors; all, be it noted, provisions relating to the organization and structure of the political departments of the government, not to the civil rights of citizens as such. Put to one side were other provisions advanced in argument as showing "that the term state is sometimes used in its more enlarged sense" on the ground that "they do not prove what was to be shown by them." *Ibid.* But cf. 446–448, 450.

Whether or not this answer was adequate at the time,[13]

---

[13] Counsel for the plaintiffs had made, among others, two different, though closely related, arguments. One was that "state" as used in the diversity clause should be given what Marshall characterized as "the signification attached to it by writers on the law of nations," a political entity in a broad and general sense. To this argument his answer was obviously appropriate. But in view of other constitutional provisions relied upon in the argument, 2 Cranch 446–448, 450, it seems at least questionable that the answer met the other contention, namely, that "those territories which are under the exclu-

our Constitution today would be very different from what it is if such a narrow and literal construction of each of its terms had been transmuted into an inflexible rule of constitutional interpretation. It is to be remembered, as bearing on the very issue before us, that the Sixth Amendment's guarantee of "an impartial jury of the State . . . wherein the crime shall have been committed" extends to criminal prosecutions in the Nation's capital.[14] Similarly, the word "Citizens" has a broader

sive government of the United States are to be considered in some respects as included in the term 'states' as used in the constitution." *Id.* at 446.

[14] The Court's initial determination that District residents were entitled to a jury trial in criminal cases, *Callan* v. *Wilson*, 127 U. S. 540, rested in large measure on the more inclusive language of Article III, § 2: "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed." The Court in the *Callan* case rejected the Government's argument that Article III, § 2, permits Congress to dispense with a jury when the crime takes place in the District rather than in a state. But Article III does not seem to have been the sole basis of decision, for the Court said, 127 U. S. at 550: "In *Reynolds* v. *United States*, 98 U. S. 145, 154, it was taken for granted that the Sixth Amendment of the Constitution secured to the people of the Territories the right of trial by jury in criminal prosecutions; . . . We cannot think that the people of this District have, in that regard, less rights than those accorded to the people of the Territories of the United States." See *District of Columbia* v. *Clawans*, 300 U. S. 617, 624; *Capital Traction Co.* v. *Hof*, 174 U. S. 1, 5; cf. *Thompson* v. *Utah*, 170 U. S. 343, 348–349.

But, though it be true that "The Sixth Amendment was not needed to require trial by jury in cases of crimes," *United States* v. *Wood*, 299 U. S. 123, 142, nevertheless the recognized right of District residents to an "impartial jury" is conferred by the force of the Sixth Amendment. See *Frazier* v. *United States*, 335 U. S. 497, 498, 514. Nor is this distinction a mere form of words: In *United States* v. *Wood*, *supra*, at 142–143, Chief Justice Hughes, in weighing the impartiality of a District of Columbia jury, noted the Article III

meaning in Article III, § 2, where it now includes corporations,[15] than it has in the privileges and immunities clause of Article IV, § 2,[16] or in the like clause of the Fourteenth Amendment.[17] Instances might, but need not, be multiplied.

In construing the diversity clause we are faced with the apparent fact that the Framers gave no deliberate consideration one way or another to the diversity litigation of citizens of the District of Columbia. And indeed, since the District was not in existence when the

---

guarantee of a jury trial and then observed: "The Sixth Amendment provided further assurances. It added that in all criminal prosecutions the accused shall enjoy the right 'to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.' "

Thus it has been uniformly assumed that in criminal prosecutions a resident of the District of Columbia is possessed of Sixth Amendment rights "to a speedy . . . trial," *United States* v. *McWilliams*, 69 F. Supp. 812, affirmed 163 F. 2d 695; "to be informed of the nature and cause of the accusation," cf. *Johnson* v. *United States*, 225 U. S. 405, 409, 411; "to be confronted with the witnesses against him," *Curtis* v. *Rives*, 123 F. 2d 936, 937; *Jordon* v. *Bondy*, 114 F. 2d 599, 602, "to have compulsory process for obtaining witnesses in his favor," *ibid.*; "and to have the Assistance of Counsel for his defence," *Noble* v. *Eicher*, 143 F. 2d 1001; see *Williams* v. *Huff*, 142 F. 2d 91, 146 F. 2d 867.

[15] See note 12 *supra.* Compare *Louisville, C. & C. R. Co.* v. *Letson*, 2 How. 497, with *Bank of the United States* v. *Deveaux*, 5 Cranch 61.

[16] *Paul* v. *Virginia*, 8 Wall. 168, 177. It is to be noted, however, that Hamilton's 80th Federalist expressly justified the grant of diversity jurisdiction as effectively implementing the guaranties of the privileges and immunities clause of Article IV.

[17] *Hague* v. *C. I. O.*, 307 U. S. 496, 514, cf. *id.* at 527; *Grosjean* v. *American Press Co.*, 297 U. S. 233, 244; *Orient Insurance Company* v. *Daggs*, 172 U. S. 557, 561.

Constitution was drafted, it seems in no way surprising that the Framers, after conferring on Congress plenary power over the future federal capital, made no express provision for litigating outside the boundaries of a hypothetical city conjectured controversies between unborn citizens and their unknown neighbors. Under these circumstances I cannot accept the proposition that absence of affirmative inclusion is, here, tantamount to deliberate exclusion.

If exclusion of District citizens is not compelled by the language of the diversity clause, it likewise cannot be spelled out by inference from the historic purposes of that clause. We have, needless to say, no concern with the merits of diversity jurisdiction;[18] nor need we resolve scholarly dispute over the substantiality of those local prejudices which, when the Constitution was drafted, the grant of diversity jurisdiction was designed to nullify.[19] Our only duty is to determine the scope of the jurisdictional grant, and we must bow to congressional determination of whether federal adjudication of local issues does more good than harm. But, in resolving the imme-

[18] For contrasting views prior to *Erie R. Co.* v. *Tompkins*, 304 U. S. 64, compare Yntema, The Jurisdiction of the Federal Courts in Controversies between Citizens of Different States, 19 A. B. A. J. 71 (1933), and Yntema and Jaffin, Preliminary Analysis of Concurrent Jurisdiction, 79 U. Pa. L. Rev. 869 (1931), with Frankfurter, A Note on Diversity Jurisdiction—In Reply to Professor Yntema, 79 U. Pa. L. Rev. 1097 (1931), and Frankfurter, Distribution of Judicial Power between United States and State Courts, 13 Corn. L. Q. 499, 520–530 (1928). For post-*Erie* analyses see Shulman, The Demise of Swift v. Tyson, 47 Yale L. J. 1336 (1938); Clark, State Law in the Federal Courts: The Brooding Omnipresence of Erie v. Tompkins, 55 Yale L. J. 267 (1946).

[19] See note 18, and see also Friendly, The Historic Basis of Diversity Jurisdiction, 41 Harv. L. Rev. 483 (1928); Warren, New Light on the History of the Federal Judiciary Act of 1789, 37 Harv. L. Rev. 49, 81–90 (1923); Frank, Historical Bases of the Federal Judicial System, 13 Law & Contem. Prob. 3, 22–28 (1948).

diate issue, we should not blink the fact that, whatever the need for federal jurisdiction over suits between litigant citizens of the several states, the same need equally compels the safeguards of federal trial for suits brought by citizens of the District of Columbia against citizens of the several states. Conversely, if we assume that today's ruling tacitly validates suits brought *by* state citizens *against* citizens of the District of Columbia, it would seem the plaintiff citizen of a state is as deserving of a federal forum when suing a District defendant as when suing a defendant in a neighbor state.

Marshall's sole premise of decision in the *Hepburn* case has failed, under the stress of time and later decision, as a test of constitutional construction. Key words like "state," "citizen," and "person" do not always and invariably mean the same thing.[20] His literal application disregarded any possible distinction between the purely political clauses and those affecting civil rights of citizens, a distinction later to receive recognition.

Moreover, Marshall himself recognized the incongruity of the decision: "It is true that as citizens of the United States, and of that particular district which is subject to the jurisdiction of congress, it is extraordinary that the courts of the United States, which are open to aliens, and to the citizens of every state in the union, should be closed upon *them.*" But, he added, "this is a subject for legislative not for judicial consideration." 2 Cranch at 453.

With all this we may well agree, with one reservation. In spite of subsequent contrary interpretation and Marshall's own identification of the statutory word "state" with the same word in the Constitution, we cannot be unreservedly sure that the last-quoted sentence referred to the process of constitutional amendment rather than

---

[20] Cf. notes 14–17 *supra* and text.

congressional reconsideration. If the former had been the intent, it seems likely it would have been stated in words not so characteristic of the latter process. The Court was construing the statute,[21] which made no explicit inclusion of citizens of the District. Whether, if it had done so, the Court's ruling would have been the same or, if a later act had sought to include District citizens, it would have been held unconstitutional, we can only speculate.

But I do not rest on this ambiguity, more especially in view of the later decisions clearly accepting the *Hepburn* decision as one of constitutional import. On the other hand, the later and general repudiation of the decision's narrow and literal rule for construing the Constitution, in which Marshall's own part was not small, has cut from beneath the *Hepburn* case its only grounding and with it, in my judgment, the anomaly in result which the ruling always has been. It is perhaps unnecessary to go so far in criticizing the decision as was done by a judge who long afterwards bowed to it.[22] But the time has come

---

[21] The arguments for the defendant were two, one statutory, the other constitutional. They were stated as follows: "Even if the constitution of the United States authorises a more enlarged jurisdiction than the judiciary act of 1789 has given, yet the court can take no jurisdiction which is not given by the act. . . .

"This is not a case between citizens of different states, within the meaning of the constitution." 2 Cranch at 449–450.

[22] After noting that the *Hepburn* decision had been extended by *New Orleans* v. *Winter*, 1 Wheat. 91, to territories and their citizens, the opinion in *Watson* v. *Brooks*, 13 F. 540, stated at 543–544: "But it is very doubtful if this ruling would now be made if the question was one of first impression; and it is to be hoped it may yet be reviewed and overthrown.

"By it, and upon a narrow and technical construction of the word 'state,' unsupported by any argument worthy of the able and distinguished judge who announced the opinion of the court, the large and growing population of American citizens resident in the District of Columbia and the eight territories of the United States are deprived of the privilege accorded to all other American citizens, as

when the hope he expressed for removing this highly un-
just discrimination from a group of our citizens larger
than the population of several states of the Union should
be realized.

## III.

Pragmatically stated, perhaps, the problem is not of
earth-shaking proportions. For, by present hypothesis,
federal court disposition of diversity suits must be in
accord with local law in all matters of substance. But
symbolically the matter is of very considerable impor-
tance. Reasonable men may differ perhaps over whether
or, more appropriately, to what extent citizens of the
District should have political status and equality with
their fellow citizens. But with reference to their civil
rights, especially in such a matter as equal access to the
federal courts, none now can be found to defend dis-
crimination against them save strictly on the ground of
precedent.

I cannot believe that the Framers intended to impose
so purposeless and indefensible a discrimination, although
they may have been guilty of understandable oversight
in not providing explicitly against it. Despite its great
age and subsequent acceptance, I think the *Hepburn* deci-
sion was ill-considered and wrongly decided. Nothing
hangs on it now except the continuance or removal of a
gross and wholly anomalous inequality applied against a
substantial group of American citizens, not in relation to
their substantive rights, but in respect to the forums
available for their determination. This Court has not

---

well as aliens, of going into the national courts when obliged to
assert or defend their legal rights away from home. Indeed, in the
language of the court in *Hepburn* v. *Ellzey, supra,* they may well say:
'It is extraordinary that the courts of the United States, which are
open to aliens, and to the citizens of every state in the Union, should
be closed upon them.' But so long as this ruling remains in force, the
judgment of this court must be governed by it."

hesitated to override even long-standing decisions when much more by way of substantial change was involved and the action taken was much less clearly justified than in this case, a most pertinent instance being *Erie R. Co. v. Tompkins, supra.*

That course should be followed here. It should be followed directly, not deviously. Although I agree with the Court's judgment, I think it overrules the *Hepburn* decision in all practical effect. With that I am in accord. But I am not in accord with the proposed extension of "legislative" jurisdiction under Article I for the first time to the federal district courts outside the District of Columbia organized pursuant to Article III, and the consequent impairment of the latter Article's limitations upon judicial power; and I would dissent from such a holding even more strongly than I would from a decision today reaffirming the *Hepburn* ruling. That extension, in my opinion, would be the most important part of today's decision, were it accepted by a majority of the Court. It is a dangerous doctrine which would return to plague both the district courts and ourselves in the future, to what extent it is impossible to say. The *O'Donoghue* and *Williams* decisions would then take on an importance they have never before had and were never considered likely to attain.

Mr. Chief Justice Vinson, with whom Mr. Justice Douglas joins, dissenting.

While I agree with the views expressed by Mr. Justice Frankfurter and Mr. Justice Rutledge which relate to the power of Congress under Art. I of the Constitution to vest federal district courts with jurisdiction over suits between citizens of States and the District of Columbia, and with the views of Mr. Justice Frankfurter and Mr. Justice Jackson as to the proper interpretation of the word "States" in the diversity clause of Art. III, I

am constrained to state my views individually because of the importance of these questions to the administration of the federal court system.

## I.

The question whether Congress has the power to extend the diversity jurisdiction of the federal district courts to citizens of the District of Columbia by virtue of its authority over the District under Art. I of the Constitution depends, in turn, upon whether the enumeration in Art. III of the cases to which the judicial power of the United States shall extend defines the outer limits of that power or is merely a listing of the types of jurisdiction with which Congress may invest federal courts without invoking any of the specific powers granted that body by other Articles of the Constitution. It has long been settled that inferior federal courts receive no powers directly from the Constitution but only such authority as is vested in them by the Congress. *Turner* v. *Bank of North-America,* 4 Dall. 8 (1799); *McIntire* v. *Wood,* 7 Cranch 504 (1813); *Kendall* v. *United States,* 12 Pet. 524 (1838); *Cary* v. *Curtis,* 3 How. 236 (1845).[1] Since, therefore, there is no minimum of power prescribed for the inferior federal courts, and Congress need not have established any such courts, *Lockerty* v. *Phillips,* 319 U. S. 182, 187 (1943), the question is whether the enumeration of cases in Art. III, § 2 prescribes a maximum of power or performs only the very limited office mentioned above.[2]

The theory that § 2 of Art. III is merely a supplement to the powers specifically granted Congress by the Con-

---

[1] See also *Sheldon* v. *Sill,* 8 How. 441 (1850); *Kline* v. *Burke Construction Co.,* 260 U. S. 226 (1922); *Lauf* v. *E. G. Shinner & Co.,* 303 U. S. 323 (1938); *Lockerty* v. *Phillips,* 319 U. S. 182 (1943).

[2] *I. e.,* is an enumeration of cases to which Congress may extend the jurisdiction of the federal courts without invoking other of its powers under the Constitution.

stitution is not, however, accepted at face value even by those who urge it. For they still would require that a case or controversy be presented. We are told that

> ."Of course there are limits to the nature of duties which Congress may impose on the constitutional courts vested with the federal judicial power . . . [but] this statute . . . does not authorize or require either the district courts or this Court to participate in any legislative, administrative, political or other nonjudicial function or to render any advisory opinion." *Ante,* pp. 590–591.

But as my Brothers FRANKFURTER and RUTLEDGE have pointed out, if Art. III contains merely a grant of power to Congress, there is no more reason to find any limitation in the fact that the judicial power extends only to cases and controversies than in the specific enumeration of the kinds of cases or controversies to which it shall extend. The fundamental error in this position, as I see it, is the failure to distinguish between two entirely different principles embodied in Art. III, as elsewhere in the Constitution, both of which were repeatedly adverted to in the Constitutional Convention and have since been followed by this Court without substantial deviation.

The first of these principles is that the three branches of government established by the Constitution are of co-ordinate rank, and that none may encroach upon the powers and functions entrusted to the others by that instrument. This principle found expression in the requirement of Art. III that the judicial power shall extend only to cases and controversies. Of equal importance, however, was the second principle, that the Constitution contains a grant of power by the states to the federal government, and that all powers not specifically granted were reserved to the states or to the people.[3] The powers

---

[3] This principle, implicit in the arguments at the Constitutional Convention, was made explicit in the 10th Amendment.

granted the federal judiciary were spelled out with care and precision in Art. III by a delineation of the kinds of cases to which the judicial power could be extended.

The first principle is not now under attack, but proper perspective in viewing the second requires some examination of its origin and history. The framers of the Constitution were presented with, and rejected, proposals which would have vested nonjudicial powers in the national judiciary. Charles Pinckney of South Carolina proposed, for example, that "Each branch of the Legislature, as well as the Supreme Executive shall have authority to require the opinions of the supreme Judicial Court upon important questions of law, and upon solemn occasions." [4] Early in the Convention, however, the principle that the courts to be established should have jurisdiction only over *cases* became fixed. Thus it was that when the proposal was made on the floor of the Convention that the words, "arising under this Constitution" be inserted before "the Laws of the United States," in what is now Art. III, § 2, Madison's objection that it was "going too far to extend the jurisdiction of the Court generally to cases arising Under the Constitution, & whether it ought not to be limited to cases of a Judiciary Nature" was met by the answer that it was, in his own words, "generally supposed that the jurisdiction given was constructively limited to cases of a Judiciary nature—." [5]

Clear as this principle is, however, it was attacked in this Court on precisely the same grounds now asserted to sustain the diversity jurisdiction here in question. In *Keller* v. *Potomac Electric Co.*, 261 U. S. 428 (1923), where this Court had before it an Act under which the courts of the District of Columbia were given revisory power over rates set by the Public Utilities Commission

---

[4] 2 Farrand, *Records of the Federal Convention* 341, hereinafter cited as Farrand.

[5] *Id.* at 430.

of the District, the appellee sought to sustain the appellate jurisdiction given this Court by the Act on the basis that "Although Art. III of the Constitution limits the jurisdiction of the federal courts, this limitation is subject to the power of Congress to enlarge the jurisdiction, where such enlargement may reasonably be required to enable Congress to exercise the express powers conferred upon it by the Constitution." 261 U. S. at 435. There, as here, the power relied upon was that given Congress to exercise exclusive jurisdiction over the District of Columbia, and to make all laws necessary and proper to carry such powers into effect. But this Court clearly and unequivocally rejected the contention that Congress could thus extend the jurisdiction of constitutional courts, citing the note to *Hayburn's Case,* 2 Dall. 409, 410 (1792); *United States* v. *Ferreira,* 13 How. 40, note, p. 52 (1851), and *Gordon* v. *United States,* 117 U. S. 697 (1864). These and other decisions of this Court clearly condition the power of a constitutional court to take cognizance of any cause upon the existence of a suit instituted according to the regular course of judicial procedure, *Marbury* v. *Madison,* 1 Cranch 137 (1803), the power to pronounce a judgment and carry it into effect between persons and parties who bring a case before it for decision, *Muskrat* v. *United States,* 219 U. S. 346 (1911); *Gordon* v. *United States, supra,* the absence of revisory or appellate power in any other branch of Government, *Hayburn's Case, supra; United States* v. *Ferreira, supra;* and the absence of administrative or legislative issues or controversies, *Keller* v. *Potomac Electric Co., supra; Postum Cereal Co.* v. *California Fig Nut Co.,* 272 U. S. 693 (1927). While "judicial power," "cases," and "controversies" have sometimes been given separate definitions,[6] these concepts are inextricably intertwined. The term "Judicial power" was itself sub-

---

[6] See *Muskrat* v. *United States,* 219 U. S. 346, 356 (1911).

stituted for the phrase, "The jurisdiction of the Supreme Court" to conform Art. III to the use of the terms "legislative Powers" and "executive Power" in Arts. I and II.[7] It thus draws life from that to which it extends: to cases and controversies. That much, at any rate, is clear. Whether it draws life from any cases or controversies other than those specifically enumerated in Art. III must now be considered.

The second principle, that any powers not specifically granted to the national judiciary by Art. III were reserved to the states or the people, is here challenged. The reason such an attack is possible at this late date is, ironically enough, because of the implicit acceptance of that principle by the framers, by Congress, and by litigants ever since. Unlike the question of the relations between the branches of government, which first arose during Washington's presidency and subsequently gave rise, in the cases previously adverted to, to frequent definition of the nature of cases and controversies, acceptance of the principle that Art. III contains a limitation on the power of the federal judiciary was so complete that the question did not often arise directly. Nevertheless, it is possible to demonstrate in a number of contexts the true intent of the framers.

First, the examination and rejection of various alternative proposals concerning the jurisdiction of the national judiciary by the Convention throws considerable light upon the compromise reached.[8] On the one hand

---

[7] 2 Farrand 425.

[8] The propriety of considering the proposals and debates of the Constitutional Convention was long ago considered by those most intimately concerned with its formulation. Washington, in his message to the House of Representatives refusing the demands of that body for the papers relating to Jay's treaty, stated: "If other proofs than these, and the plain letter of the Constitution itself, be necessary to ascertain the point under consideration, they may be found·

were those who thought that no inferior federal tribunals should be authorized; that state courts should be entrusted with the decision of all federal questions, subject to appeal to one Supreme Court. Madison's notes reveal that

> "Mr. Rutlidge havg. obtained a rule for reconsideration of the clause for establishing *inferior* tribunals under the national authority, now moved that that part of the clause . . . should be expunged: arguing that the State Tribunals might and ought to be left in all cases to decide in the first instance the right of appeal to the supreme national tribunal being sufficient to secure the national rights & uniformity of Judgmts: that it was making an unnecessary encroachment on the jurisdiction of the States, and creating unnecessary obstacles to their adoption of the new system." [9]

The motion was carried and the clause establishing inferior federal tribunals excised from the draft Constitution. Madison, however, immediately moved "that the National Legislature be empowered to institute inferior tribunals," urging that some provision for such courts was a necessity in a federal system. Madison's notes then record the reaction of Pierce Butler of South Carolina to this proposal:

---

in the Journals of the General Convention, which I have deposited in the office of the Department of State. In those Journals it will appear, that a proposition was made, 'that no Treaty should be binding on the United States which was not ratified by a law,' and that the proposition was explicitly rejected." 5 Annals of Congress, Fourth Congress, 1st Sess., p. 761. See also the comment of Madison at a later date. 9 *Writings of James Madison* 240.

[9] 1 Farrand 124. See the argument of Luther Martin before the Maryland House of Representatives opposing ratification of the Constitution in 3 Farrand 156. See also 2 Elliot, *Debates* 408; 3 *id.* at 562 *et seq.*

"The people will not bear such innovations. The States will revolt at such encroachments. Supposing such an establishment to be useful, we must not venture on it. We must follow the example of Solon who gave the Athenians not the best Govt. he could devise; but the best they wd. receive." [10]

On the other hand, some members of the Convention favored a wider federal jurisdiction than was ultimately authorized. The Connecticut delegation, led by Roger Sherman, proposed "That the legislature of the United States be authorised to institute one supreme tribunal, and such other tribunals as they may judge necessary for the purpose aforesaid, and ascertain their respective powers and jurisdictions." [11] This proposal, which is not substantially different in its effect from the interpretation now urged upon us, was not adopted by the Convention. When it became established that inferior federal courts were to be authorized by the Constitution, the limits of their jurisdiction immediately became an issue of paramount importance. The outline of federal jurisdiction was established only after much give and take, proposal and counterproposal, and—in the end—compromise. It was early proposed, for example, that federal jurisdiction be made to extend to "all piracies & felonies on the high seas, captures from an enemy; cases in which foreigners or citizens of other States applying to such jurisdictions may be interested, or which respect the collection of the National revenue; impeachments of any National officers, and questions which may involve the national peace and harmony." [12] But this was only one of many proposals concerning the extent

---

[10] This account, taken from Madison's notes, is found in 1 Farrand 124–125.

[11] 3 Farrand 616.

[12] 1 Farrand at 22.

of federal jurisdiction,[13] ana not before many concessions and compromises had been made was the enumeration of cases now found in Art. III, § 2 agreed upon.

The judicial power was thus jealously guarded by the states and unwillingly granted to the national judiciary. Only when it could be demonstrated that a particular head of jurisdiction was acutely needed for the purposes of uniformity and national harmony was it granted. In every state convention for ratification of the Constitution, advocates and opponents of ratification considered in detail the kinds of cases and controversies to which the national judicial power was to extend. Each had to be justified.[14] Far from assuming that the judicial power could be, by any means short of constitutional amendment, extended beyond those cases expressly provided for in Art. III, that Article was subjected to severe attacks on the ground that those powers specifically given

---

[13] *Id.* at 231. The sense of the Convention at this point was expressed in Yates' Notes as follows: "Gov. Randolph observed the difficulty in establishing the powers of the judiciary—the object however at present is to establish this principle, to wit, the security of foreigners where treaties are in their favor, and to preserve the harmony of states and that of the citizens thereof. This being once established, it will be the business of a sub-committee to detail it; and therefore moved to obliterate such parts of the resolve so as only to establish the principle, to wit, *that the jurisdiction of the national judiciary shall extend to all cases of national revenue, impeachment of national officers, and questions which involve the national peace or harmony.* Agreed to unanimously." 1 Farrand 238.

[14] See, *e. g.,* Madison's defense of the Judiciary Article before the Virginia Convention, 5 *Writings of James Madison* 216–225; 2 Elliot, *Debates* 109; *id.* at 409, where among the resolutions affecting Art. III was one which "*Resolved,* as the opinion of this committee, that the jurisdiction of the Supreme Court of the United States, or of any other court to be instituted by the Congress, ought not, in any case, to be increased, enlarged, or extended, by any fiction, collusion, or mere suggestion"; *id.* at 489–494; 3 Elliot, *Debates* 517–584.

would destroy the state courts. A delegate to the Virginia Convention, for example, stated that "My next objection to *the federal judiciary* is, that it is not expressed in a definite manner. The jurisdiction of all cases arising under the Constitution and the laws of the Union is of stupendous magnitude." [15] If, in addition to justifying every particle of power given to federal courts by the Constitution, its defenders had been obliged to justify the competence of Congress—itself suspect by those who opposed ratification—to extend that jurisdiction whenever it was thought necessary to effectuate one of the powers expressly given that body, their task would have been insuperable. The debates make that fact plain.

That the federal judicial power was restricted to those classes of cases set forth in Art. III was clearly the opinion of those who had most to do with its drafting and acceptance. In the 80th Number of The Federalist, Hamilton listed the types of cases to which it was thought necessary that the judiciary authority of the nation should extend. All are found represented in Art. III. [16] In the 81st Number, he wrote:

---

[15] 3 Elliot, *Debates* 565. And see Patrick Henry's remarks, *id.* at 539–546.

[16] The cases enumerated were the following: "1st, to all those which arise out of the laws of the United States, passed in pursuance of their just and constitutional powers of legislation; 2d, to all those which concern the execution of the provisions expressly contained in the articles of Union; 3d, to all those in which the United States are a party; 4th, to all those which involve the PEACE of the CONFEDERACY, whether they relate to the intercourse between the United States and foreign nations, or to that between the States themselves; 5th, to all those which originate on the high seas, and are of admiralty or maritime jurisdiction; and, lastly, to all those in which the State tribunals cannot be supposed to be impartial and unbiased." P. 494.

636

"The amount of the observations hitherto made on the authority of the judicial department is this: *that it has been carefully restricted to those causes which are manifestly proper* for the cognizance of the national judicature . . . ." P. 511. (Emphasis added.)

while in No. 82, the following appears:

"The only outlines described [for inferior courts] are that they shall be 'inferior to the Supreme Court,' and that *they shall not exceed the specified limits of the federal judiciary.*" P. 516. (Emphasis added.)

And Madison, in a letter to a correspondent who had contended that the common law had been incorporated by the Constitution as federal law, wrote:

"A characteristic peculiarity of the Govt. of the U. States is, that its powers consist of special grants taken from the general mass of power, whereas other Govts. possess the general mass with special exceptions only. Such being the plan of the Constitution, it cannot well be supposed that the Body which framed it with so much deliberation, and with so manifest a purpose of specifying its objects, and defining its boundaries, would, if intending that the Common Law shd. be a part of the national code, have omitted to express or distinctly indicate the intention; when so many far inferior provisions are so carefully inserted, and such appears to have been the public view taken of the Instrument, whether we recur to the period of its ratification by the States, or to the federal practice under it." [17]

---

[17] 9 *Writings of James Madison* 199–200. And see *United States* v. *Hudson and Goodwin,* 7 Cranch 32 (1812); *Erie R. Co.* v. *Tompkins,* 304 U. S. 64 (1938).

Cases in this Court which support the view that Art. III, § 2 limits the power of constitutional courts are not lacking. In *The Mayor* v. *Cooper,* 6 Wall. 247, 252 (1867), the Court defined the jurisdiction of inferior federal courts as follows:

> "As regards all courts of the United States inferior to this tribunal, two things are necessary to create jurisdiction, whether original or appellate. *The Constitution must have given to the court the capacity to take it,* and an act of Congress must have supplied it. Their concurrence is necessary to vest it. It is the duty of Congress to act for that purpose up to the limits of the granted power. *They may fall short of it, but cannot exceed it."* (Emphasis added.)

And in a series of three cases decided between 1800 and 1809, the Court refused to give literal effect to § 11 of the Judiciary Act of 1789, which had extended the jurisdiction of Circuit Courts to suits where "an alien is a party," because of the limitations imposed by Art. III. In *Mossman* v. *Higginson,* 4 Dall. 12, 14 (1800), it was decided that "as the legislative power of conferring jurisdiction on the federal Courts, is, in this respect, confined to suits *between citizens and foreigners,* we must so expound the terms of the law, as to meet the case, 'where, indeed, an alien is one party,' but a citizen is the other." This construction of the statute was adhered to in *Montalet* v. *Murray,* 4 Cranch 46 (1807); and in *Hodgson* v. *Bowerbank,* 5 Cranch 303 (1809), where Chief Justice Marshall dismissed the contention that "The judiciary act gives jurisdiction to the circuit courts in all suits in which *an alien is a party*" with this admonition: "Turn to the article of the constitution of the United States, for the statute cannot extend the jurisdiction beyond the limits of the constitution."

Other examples may be cited of the Court's consistent adherence to the principle that the judicial power of the United States is a constituent part of the concessions made by the states to the federal government and may not be extended. See *Turner* v. *Bank of North-America, supra; United States* v. *Hudson and Goodwin,* 7 Cranch 32, 33 (1812); *Murray's Lessee* v. *Hoboken Land and Improvement Co.,* 18 How. 272, 280–281 (1855); *Kline* v. *Burke Construction Co.,* 260 U. S. 226, 233–234 (1922); *Ex parte Bakelite Corp.,* 279 U. S. 438, 449 (1929); *Federal Radio Commission* v. *General Electric Co.,* 281 U. S. 464, 469 (1930). Over a century and a half of consistent interpretation of Art. III is well summed up in one sentence from this Court's opinion in *Sheldon* v. *Sill,* 8 How. 441, 449 (1850):

> "The Constitution has defined the limits of the judicial power of the United States, but has not prescribed how much of it shall be exercised by the Circuit Court; consequently, the statute which does prescribe the limits of their jurisdiction, cannot be in conflict with the Constitution, *unless it confers powers not enumerated therein.*" (Emphasis added.)

The cases chiefly relied upon by those who contend that Art. III does not define the limits of the judicial power are *O'Donoghue* v. *United States,* 289 U. S. 516 (1933), and *Williams* v. *United States,* 289 U. S. 553 (1933), which concerned reductions in salary of judges of the District Court for the District of Columbia and the Court of Claims respectively. In these cases, this Court held that Art. III, § 1 of the Constitution forbade reduction of the salary of the former, who was found to be a judge of a "constitutional" (*i. e.,* an inferior court as used in Arts. I and III) court, but not of the latter, a judge of a "legislative" court.

Two separate but related points concerning the *O'Donoghue* case should be emphasized. The first is that since

District of Columbia courts may be given nonjudicial duties, *Butterworth* v. *Hoe,* 112 U. S. 50 (1884); *Baldwin Co.* v. *Howard Co.,* 256 U. S. 35 (1921); *Keller* v. *Potomac Electric Co., supra,* reliance upon that case to support the Act now under consideration is incompatible with the position that constitutional courts may only decide "cases" and "controversies" of a judicial nature. The second is that the rationale of the *O'Donoghue* case is, by its terms, limited to courts of the District. For the Court said (at p. 546): "If, in creating and defining the jurisdiction of the courts of the District, Congress were limited to Art. III, as it is in dealing with the other federal courts, the administrative and other jurisdiction spoken of could not be conferred upon the former."

In view of this express limitation, the *O'Donoghue* case lends no support to the Act now in question. To extend its applicability beyond the courts of the District is warranted neither by the language nor the reasoning of that case. The Court in no way diminished the authority of *American Insurance Co.* v. *Canter,* 1 Pet. 511 (1828), which had held that the courts of Florida Territory were legislative courts not created pursuant to Art. III and incapable of receiving the judicial power set out therein. Since territorial courts cannot be invested with Art. III power, the strict dichotomy between legislative and constitutional courts still exists—except in the District of Columbia. It is not enough to refer to the breadth of congressional power over the District; that such power is national in character rather than merely local. The power of Congress over the territories is equally broad, yet territorial courts cannot be invested with Art. III power under the *O'Donoghue* case. And some of the very statements now relied upon as indicating the scope of Congress' power over the District [18] were quoted in the

---

[18] From *Grether* v. *Wright,* 75 F. 742 (1896).

*O'Donoghue* case, but the rationale of that case was expressly limited to courts of the District, as noted above. The District of Columbia courts were there regarded as unique—different in powers and makeup from either territorial courts or other constitutional courts. Extension of the *O'Donoghue* case to all constitutional courts is clearly unwarranted under these circumstances, especially in the face of the uncontradicted constitutional history previously outlined.

Except in the District of Columbia, therefore, *American Insurance Co.* v. *Canter, supra,* and a long line of cases in the same vein [19] prohibit the intermixture or combination of the personnel, powers, or duties of constitutional and legislative courts. Whether a court is of one category or the other depends upon what power of Congress was utilized in its creation. If it was the power to create inferior constitutional courts, the court may exercise only the judicial power outlined in Art. III. If Congress creates a judicial body to implement another of its constitutional powers, that body is a legislative court and may exercise none of the judicial power of Art. III.[20] We have

---

[19] See e. g., *Benner* v. *Porter,* 9 How. 235 (1850); *Clinton* v. *Englebrecht,* 13 Wall. 434 (1871); *Reynolds* v. *United States,* 98 U. S. 145 (1878); *McAllister* v. *United States,* 141 U. S. 174 (1891); *United States* v. *Burroughs,* 289 U. S. 159 (1933); *Ex parte Bakelite Corp.,* 279 U. S. 438 (1929).

[20] In *Williams* v. *United States,* 289 U. S. 553 (1933), the Court found that the Court of Claims had been created pursuant to the power of Congress under Art. I to pay the debts of the United States and had been given powers and duties inconsistent with those of an Art. III court. The Court's consideration of the question whether "Controversies to which the United States shall be a Party" in Art. III includes suits against the United States was therefore unnecessary to the decision, since an affirmative answer would not have converted the Court of Claims into a constitutional court. It is "incapable of receiving" the Art. III power. *American Insurance Co.* v. *Canter, supra.* Furthermore, the Court recognized inferentially that the Court of Claims does exercise jurisdiction over some

held that the answer to the question whether a court is of one kind or another "lies in the power under which the court was created and in the jurisdiction conferred." *Ex parte Bakelite Corp., supra* at 459. I would adhere to that test.

What has been said does not mean, of course, that legislative courts cannot exercise jurisdiction over questions of the same nature as those enumerated in Art. III, § 2. It was clearly contemplated by the framers that state courts should have federal question jurisdiction concurrent with that exercised by inferior federal courts, yet they are not constitutional courts nor do they exercise the judicial power of Art. III. The legislative courts created by Congress also can and do decide questions arising under the Constitution and laws of the United States (and, in the case of territorial courts, other types of jurisdiction enumerated in Art. III, § 2 as well), but that jurisdiction is not, and· cannot be, "a part of that judicial power which is defined in the 3d article of the Constitution." These courts are "incapable of receiving it." *American Insurance Co.* v. *Canter, supra* at 546; *Reynolds* v. *United States, supra* at 154.[21]

---

questions of the kind enumerated in Art. III when, with reference to claims founded upon the Constitution, it held that "the requirement is one imposed by the Constitution and equally applicable whether jurisdiction be exercised by a legislative court or a constitutional court." 289 U. S. at 581. Since Court of Claims jurisdiction also includes claims founded upon any Act of Congress, it is clear that that court exercises parallel jurisdiction with that of constitutional courts over cases arising under the Constitution and laws of the United States, although limited to suits involving claims against the United States. This points up the fact that the Court's discussion of the phrase, "Controversies to which the United States shall be a Party," was unnecessary to the decision.

[21] It is argued that because federal district courts exercise jurisdiction over claims against the United States concurrent with that of the Court of Claims, the former are exercising jurisdiction of non-Art. III nature. Whether or not the dictum in *Williams* v. *United*

The appellate jurisdiction of this Court is, in fact, dependent upon the fact that the case reviewed is of a kind within the Art. III enumeration. That article, after setting out the cases of which inferior courts may take

*States*, 289 U. S. 553 (1933) that suits against the United States are not within the Art. III phrase, "Controversies to which the United States shall be a Party," proves correct, see note 20, *supra*, such actions seem to be clearly within the Art. III federal question jurisdiction. See 2 Moore, *Federal Practice* (1948 ed.) 1633. Of course the fact that Congress extends the jurisdiction of federal courts to suits involving certain subject matter does not itself make them the subject of federal question jurisdiction. But the sovereign's immunity from suit has never been regarded simply as a question of unavailability of a forum. As Hamilton said in The Federalist, No. 81, p. 508: "The contracts between a nation and individuals are only binding on the conscience of the sovereign, and have no pretensions to a compulsive force. They confer no right of action, independent of the sovereign will." When the sovereign consents to be sued, therefore, considerably more is involved than opening the courts to plaintiffs already possessed of causes of action. For as Mr. Justice Brandeis said in *Lynch* v. *United States*, 292 U. S. 571, 582 (1934): "The sovereign's immunity from suit exists whatever the character of the proceeding or the source of the right sought to be enforced. It applies alike to causes of action arising under acts of Congress, . . . and to those arising from some violation of rights conferred upon the citizen by the Constitution, . . . The character of the cause of action—the fact that it is in contract as distinguished from tort—may be important in determining (as under the Tucker Act) whether consent to sue was given. Otherwise, it is of no significance. For immunity from suit is an attribute of sovereignty which may not be bartered away."

Since any right of action against the United States is completely and wholly dependent upon whether an Act of Congress has authorized the suit, see *United States* v. *Minnesota Mutual Investment Co.*, 271 U. S. 212, 217 (1926), a question arising under the laws of the United States, as that phrase is used in Art. III, is clearly presented by any claim against the federal government. Since Congress has decreed that all such actions shall be brought in federal courts, the question presented in *Gully* v. *First National Bank*, 299 U. S. 109 (1936), *Puerto Rico* v. *Russell & Co.*, 288 U. S. 476 (1933) and related cases is not involved.

cognizance and the original jurisdiction of this Court, extends the appellate jurisdiction of the Supreme Court only as far as "all the other Cases *before mentioned.*" (Emphasis added.) We can no more review a legislative court's decision of a case which is not among those enumerated in Art. III than we can hear a case from a state court involving purely state law questions. But a question under the Constitution and laws of the United States, whether arising in a constitutional court, a state court, or a legislative court may, under the Constitution, be a subject of this Court's appellate jurisdiction. It was long ago held that

> "The appellate power is not limited by the terms of the third article to any particular courts. The words are, 'the judicial power (which includes appellate power) shall extend *to all cases,*' &c., and 'in all other cases before mentioned the supreme court shall have appellate jurisdiction.' It is the *case*, then, and not *the court,* that gives the jurisdiction. If the judicial power extends to the case, it will be in vain to search in the letter of the constitution for any qualification as to the tribunal where it depends."
> *Martin* v. *Hunter's Lessee,* 1 Wheat. 304, 338 (1816).

There is no anomaly, therefore, in the fact that legislative courts, as well as constitutional courts, exercise federal question jurisdiction, and that they sometimes exercise concurrent jurisdiction over the same matters. That does not make the former constitutional courts, *American Insurance Co.* v. *Canter, supra; Ex parte Bakelite Corp., supra.* Still less does it make the latter legislative courts, which is the effect of the statute now being considered. It is one thing to say that legislative courts may exercise jurisdiction over some of the same matters that are within Art. III judicial power. It is quite another thing to hold that constitutional courts may take cognizance of causes which are not within the scope of that power.

It may be argued that the distinction between constitutional and legislative courts is meaningless if the latter may be invested with jurisdiction over the subjects of Art. III judicial power. But there are limitations which insure the preservation of the system of federal constitutional courts distinct from legislative courts. In the first place, a legislative court must be established under some one of the specific powers given to Congress, and it is unlikely that all of the subjects of the judicial power could be justified as an exercise of those powers.[22] Furthermore, we cannot impute to Congress an intent now or in the future to transfer jurisdiction from constitutional to legislative courts for the purpose of emasculating the former. Chief Justice Marshall suggested another limitation in the *Canter* case, when he said that within the States, admiralty jurisdiction can be exercised solely by constitutional courts, although that limitation does not apply to the Territories. It is at least open to question, therefore, whether all of the subjects of Art. III judicial power, or only federal question jurisdiction, may be transferred to legislative courts within the States. Finally, *Ex parte Bakelite Corp., supra,* has been read as suggesting that the jurisdiction of legislative courts is limited to matters which, while proper subjects of judicial determination, need not be so determined under the Constitution.[23] The least that may be said is that no decisions of this Court have suggested that legislative courts may take over the entire field of federal judicial authority.

There is a certain surface appeal to the argument that, if Congress may create statutory courts to hear these cases, it should be able to adopt the less expensive and more practical expedient of vesting that jurisdiction

---

[22] Except, perhaps, when Congress legislates for the Territories or the District of Columbia.

[23] Katz, *Federal Legislative Courts*, 43 Harv. L. Rev. 894, 916–917.

in the existing and functioning federal courts throughout the country. No doubt a similar argument was pressed upon the judges in *Hayburn's Case*. Unless expediency is to be the test of jurisdiction of the federal courts, however, the argument falls of its own weight. The framers unquestionably intended that the jurisdiction of inferior federal courts be limited to those cases and controversies enumerated in Art. III. I would not sacrifice that principle on the altar of expediency.

## II.

There are numerous sections of the Constitution which are concerned solely with the mechanics of government and, of necessity, set rather arbitrary limits upon the exercise of power by the three branches of government. No doubt requirements of this kind have proven in the past, and may, in the future, prove unduly restrictive and undesirable. Yet if a question concerning any one of them were before us, I do not suppose that any member of the Court would read into the Constitution the changes thought desirable in our day.

The only difference in respect of the most explicit of these limitations of power and the limitation imposed by the word "State" in Art. III is that the meaning urged upon the Court is not expressly controverted by the language of the Constitution. That it was not the specific intent of the framers to extend diversity jurisdiction to suits between citizens of the District of Columbia and the States seems to be conceded. One well versed in that subject, writing for the Court within a few years of adoption of the Constitution, so held.

The question is, then, whether this is one of those sections of the Constitution to which time and experience were intended to give content, or a provision concerned solely with the mechanics of government. I think there can be little doubt but that it was the latter. That we

would now write the section differently seems hardly a sufficient justification for an interpretation admittedly inconsonant with the intent of the framers. Ours is not an amendatory function.

I hardly need add that I consider a finding of unconstitutionality of a statute a matter of grave concern. Nevertheless, Congress cannot do that which the Constitution specifically forbids. I think that it has attempted to do so here.

MR. JUSTICE FRANKFURTER, with whom MR. JUSTICE REED concurs, dissenting.

No provisions of the Constitution, barring only those that draw on arithmetic, as in prescribing the qualifying age for a President and members of a Congress or the length of their tenure of office, are more explicit and specific than those pertaining to courts established under Article III. "The judicial power" which is "vested" in these tribunals and the safeguards under which their judges function are enumerated with particularity. Their tenure and compensation, the controversies which may be brought before them, and the distribution of original and appellate jurisdiction among these tribunals are defined and circumscribed, not left at large by vague and elastic phrasing. The precision which characterizes these portions of Article III is in striking contrast to the imprecision of so many other provisions of the Constitution dealing with other very vital aspects of government. This was not due to chance or ineptitude on the part of the Framers. The differences in subject-matter account for the drastic differences in treatment. Great concepts like "Commerce . . . among the several States," "due process of law," "liberty," "property" were purposely left to gather meaning from experience. For they relate to the whole domain of social and economic fact, and the statesmen who founded this Nation knew too well that only a stagnant society remains unchanged. But when

the Constitution in turn gives strict definition of power or specific limitations upon it we cannot extend the definition or remove the translation. Precisely because "it is *a constitution* we are expounding," *M'Culloch* v. *Maryland,* 4 Wheat. 316, 407, we ought not to take liberties with it.

There was deep distrust of a federal judicial system, as against the State judiciaries, in the Constitutional Convention. This distrust was reflected in the evolution of Article III.[1] Moreover, when they dealt with the distribution of judicial power as between the courts of the States and the courts of the United States, the Framers were dealing with a technical subject in a professional way. More than that, since the judges of the courts for which Article III made provision not only had the last word (apart from amending the Constitution) but also enjoyed life tenure, it was an essential safeguard against control by the judiciary of its own jurisdiction, to define the jurisdiction of those courts with particularity. The Framers guarded against the self-will of the courts as well as against the will of Congress by marking with exactitude the outer limits of federal judicial power.

According to Article III, only "judicial power" can be "vested" in the courts established under it. At least this limitation, which has been the law of the land since 1792, *Hayburn's Case,* 2 Dall. 409, is not yet called into question. And so the President could not today elicit this Court's views on ticklish problems of international law any more than Washington was able to do in 1793. See the exchange between Secretary of State Jefferson and Chief Justice Jay in 3 Johnston, Correspondence and

---

[1] The story of the scope of jurisdiction of the federal courts devised by Article III is easily traceable through the admirable index in Farrand, *The Records of the Federal Convention* (Rev. ed., 1937); the data are assembled in Prescott, *Drafting the Federal Constitution,* ch. 17 (1941); see also Friendly, *The Historic Basis of Diversity Jurisdiction,* 41 Harv. L. Rev. 483 (1928).

648

Public Papers of John Jay, 486–89 (1891), and 10 Sparks, Writings of George Washington, 542-45 (1840).

But if courts established under Article III can exercise wider jurisdiction than that defined and confined by Article III, and if they are available to effectuate the various substantive powers of Congress, such as the power to legislate for the District of Columbia, what justification is there for interpreting Article III as imposing one restriction in the exercise of those other powers of the Congress—the restriction to the exercise of "judicial power"—yet not interpreting it as imposing the restrictions that are most explicit, namely, the particularization of the "cases" to which "the judicial Power shall extend"?

It is conceded that the claim for which access is sought in the District Court for Maryland, one of the courts established under Article III, is not included among the "cases" to which the judicial power can be made to extend. But if the precise enumeration of cases as to which Article III authorized Congress to grant jurisdiction to the United States District Courts does not preclude Congress from vesting these courts with authority which Article III disallows, by what rule of reason is Congress to be precluded from bringing to its aid the advisory opinions of this Court or of the Courts of Appeals? In the exercise of its constitutional power to regulate commerce, to establish uniform rules of naturalization, to raise and support armies, or to execute any of the other powers of Congress that are no less vital than its power to legislate for the District of Columbia, the Congress may be greatly in need of informed and disinterested legal advice. If Congress may grant to the United States District Courts authority to act in situations in which Article III denies it, why may not this Court respond to calls upon it by Congress if confronted with the conscientious belief of Congress that such a call is made under the Necessary-and-Proper Clause in order to deal wisely and effectively with some substantive con-

stitutional power of Congress? Again, if the United States District Courts are not limited to the jurisdiction rigidly defined by Article III, why is the jurisdiction of this Court restricted to original jurisdiction only in "Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party"? Why is not Congress justified in conferring original jurisdiction upon this Court in litigation involving the exercise of its power to make all laws which shall be necessary and proper "for carrying into Execution" its power "To declare War," or "To raise and support Armies"?

Courts set up under Article III to exercise the judicial power of the United States do so either because of the nature of the subject-matter or because of the special position of the parties. So far as the subject-matter is concerned, it extends to cases arising under the "Constitution, the Laws of the United States, and Treaties," as well as "to all Cases of admiralty and maritime Jurisdiction." Article I, § 8, is an enumeration of the subjects in relation to which the Constitution authorizes Congress to make laws. Its eighteen divisions of legislative power are the sources of federal rights and sanctions. Laws enacted under them are "the Laws of the United States," to which the "judicial power," granted by Article III, extends. Laws affecting revenue, war, commerce, immigration, naturalization, bankruptcy, and the rest, as well as the vast range of laws authorized by the "Necessary-and-Proper" Clause, are the generating sources of "all Cases, in Law and Equity, arising under . . . the Laws of the United States," and therefore cognizable by the courts established under Article III. Congress can authorize the making of contracts; it can therefore authorize suit thereon in any district court. Congress can establish post offices; it can therefore authorize suits against the United States for the negligent killing of a child by a post-office truck.

Insofar as the courts established under Article III can entertain a case not involving the Constitution, the laws of the United States or treaties, nor concerning admiralty, they do so because of the status of the parties, enumerated with particularity in Article III.

We are here concerned with the power of the federal courts to adjudicate merely because of the citizenship of the parties. Power to adjudicate between citizens of different states, merely because they are citizens of different states, has no relation to any substantive rights created by Congress. When the sole source of the right to be enforced is the law of a State, the right to resort to a federal court is restricted to "Citizens of different States." The right to enforce such State-created obligations derives its sole strength from Article III. No other provision of the Constitution lends support. But for Article III, the judicial enforcement of rights which only a State, not the United States, creates would be confined to State courts. It is Article III and nothing outside it that authorizes Congress to treat federal courts as "only another court of the State," *Guaranty Trust Co.* v. *York,* 326 U. S. 99, 108, and Article III allows it to do so only when the parties are citizens of different "States." If Congress, in its law-making power over the District of Columbia, created some right for the inhabitants of the District, it could choose to provide for the enforcement of that right in any court of the United States, because the case would be one arising under "the Laws of the United States." But here the controversy is one arising not under the laws of the United States but under the laws of Maryland. By the command of the Constitution, this Maryland-created right can be enforced in a federal court only if the controversy is between "Citizens of different States" in relation to the State in which the federal court is sitting.

The diversity jurisdiction of the federal courts was probably the most tenuously founded and most unwill-

ingly granted of all the heads of federal jurisdiction which Congress was empowered by Article III to confer. It is a matter of common knowledge that the jurisdiction of the federal courts based merely on diversity of citizenship has been more continuously under fire than any other.[2] Inertia largely accounts for its retention. By withdrawing the meretricious advantages which diversity jurisdiction afforded one of the parties in some types of litigation, *Erie R. Co.* v. *Tompkins,* 304 U. S. 64, has happily eliminated some practical but indefensible reasons for its retention. An Act for the elimination of diversity jurisdiction could fairly be called an Act for the relief of the federal courts. Concededly, no great public interest or libertarian principle is at stake in the desire of a corporation which happens to have been chartered in the District of Columbia, to pursue its claim against a citizen of Maryland in the federal court in Maryland on the theory that the right of this artificial citizen of the District of Columbia cannot be vindicated in the State courts of Maryland.

But in any event, the dislocation of the Constitutional scheme for the establishment of the federal judiciary and the distribution of jurisdiction among its tribunals so carefully formulated in Article III is too heavy a price to pay for whatever advantage there may be to a citizen of the District, natural or artificial, to go to a federal court in a particular State instead of to the State court in suing a citizen of that State. Nor is it merely a dislocation for the purpose of accomplishing a result of trivial importance in the practical affairs of life. The process

---

[2] See for example, Hearings and S. Rep. No. 626, on S. 3151, 70th Cong., 1st Sess. (1928); S. Rep. No. 691, on S. 4357, 71st Cong., 2d Sess. (1930); S. 937, S. 939, H. R. 10594, H. R. 11508, S. Rep. No. 530 and S. Rep. No. 701, 72d Cong., 1st Sess. (1932); Hearings on S. 466, 79th Cong., 1st Sess. (1945). Earlier attacks on diversity jurisdiction are summarized in Frankfurter and Landis, *The Business of the Supreme Court,* 90 *et seq.,* 136 *et seq.* (1928).

of reasoning by which this result is reached invites a use of the federal courts which breaks with the whole history of the federal judiciary and disregards the wise policy behind that history. It was because Article III defines and confines the limits of jurisdiction of the courts which are established under Article III that the first Court of Claims Act fell, *Gordon* v. *United States,* 2 Wall. 561, 117 U. S. 697. And it was in observance of these Constitutional limits that this Court had to decline appellate powers sought to be conferred by the Congress in an exercise of its legislative power over the District. *Keller* v. *Potomac Electric Power Co.,* 261 U. S. 428.

To find a source for "the judicial Power," therefore, which may be exercised by courts established under Article III of the Constitution outside that Article would be to disregard the distribution of powers made by the Constitution.[3] The other alternative—to expand "the judicial

---

[3] Reliance on *Williams* v. *Austrian,* 331 U. S. 642, 657, seems singularly inapposite. When a petition for bankruptcy is filed, there may be outstanding claims by the bankrupt against debtors and by creditors against the bankrupt. Of course Congress has power to determine whether all such claims—those for, and those against, the bankrupt estate—should be enforced through the federal courts. That a particular claim dissociated from the fact of bankruptcy would have to be brought in a State court for want of any ground of federal jurisdiction is irrelevant. This is so because in the exercise of its power to "pass uniform laws on the subject of bankruptcies" Congress may deem it desirable that the federal courts be utilized for all the claims that pertain to the bankrupt estate whether in the federal court in which the bankruptcy proceeding is pending or in a more convenient federal court. The congeries of controversies thus brought into being by reason of bankruptcy may be lodged in the federal courts because they arise under "the Laws of the United States," to wit, laws concerning the "subject of bankruptcies." It is a matter of congressional policy whether there must be a concourse of all claims affecting the bankrupt's estate in the federal court in which the bankruptcy proceeding is pending or whether auxiliary suits be pursued in other federal courts.

Power" of Article III to include a controversy between a citizen of the District of Columbia and a citizen of one of the States by virtue of the provision extending "the judicial Power" to controversies "between Citizens of different States"—would disregard an explicit limitation of Article III. For a hundred and fifty years "States" as there used meant "States"—the political organizations that form the Union and alone have power to amend the Constitution. The word did not cover the district which was to become "the Seat of the Government of the United States," nor the "Territory" belonging to the United States, both of which the Constitution dealt with in differentiation from the States. A decent respect for unbroken history since the country's foundation, for contemporaneous interpretation by those best qualified to make it, for the capacity of the distinguished lawyers among the Framers to express themselves with precision when dealing with technical matters, unite to admonish against disregarding the explicit language of Article III extending the diversity jurisdiction of the federal courts "to Controversies . . . . between Citizens of different States," not to controversies between "Citizens of different States, including the District and the Territory of the United States."

The Framers, in making provision in regard to "States," meant the States which sent them as delegates to the Philadelphia Convention and the States which were to be admitted later. It was not contemplated that the district which was to become the seat of government could ever become a State. Marshall had no mean share in securing adoption of the Constitution and took special interest in the Judiciary Article. He merely gave expression to the common understanding—the best test of the meaning of words—when he rejected summarily the notion that the Citizens of the District are included among Citizens of "States."

The very subject-matter of §§ 1 and 2 of Article III is technical in the esteemed sense of that term. These sections do not deal with generalities expanding with experience. Provisions for the organization of courts and their jurisdiction presuppose definiteness and precision of phrasing. These requirements were heeded and met by those who were concerned with framing the Judiciary Article; Wilson and Madison and Morris and Rutledge and Sherman were lawyers of learning and astuteness. The scope of the judicial power with which the federal courts were to be entrusted was, as I have said, one of the most sharply debated and thoroughly canvassed subjects in Independence Hall. When the Framers finally decided to extend the judicial Power to controversies "between Citizens of different States," they meant to be restrictive in the use of that term. They were not unaware of the fact that outside the States there was the Northwest Territory, and that there was to be a Seat of Government. Considering their responsibility, their professional habits, and their alertness regarding the details of Article III, the precise enumeration of the heads of jurisdiction made by the Framers ought to preclude the notion that they shared the latitudinarian attitude of Alice in Wonderland toward language.

It is suggested that other provisions of the Constitution relating to "States" apply to the District. If the mere repetition of an inaccuracy begets truth, then that statement is true, not otherwise. Decisions concerned with the District involving trial by jury in criminal and civil cases, full faith and credit for its proceedings, and the power to tax residents, rest on provisions in the Constitution not limited to "States." There may be a decision in which the source of rights or obligations affecting the District of Columbia derives from a legal right relating solely to "States" or a duty to which only "States" must be obedient. I know of no such case.

Of course every indulgence must be entertained in favor of constitutionality when legislation of Congress can fairly be deemed an exercise of the discretion, in the formulation of policy, given to Congress by the Constitution. But the cases to which jurisdiction may be extended under Article III to the courts established under it preclude any claim of discretionary authority to add to the cases listed by Article III or to change the distribution as between original and appellate jurisdiction made by that Article. Congress need not establish inferior courts; Congress need not grant the full scope of jurisdiction which it is empowered to vest in them; Congress need not give this Court any appellate power; it may withdraw appellate jurisdiction once conferred and it may do so even while a case is *sub judice*. *Ex parte McCardle*, 7 Wall. 506. But when the Constitution defined the ultimate limits of judicial power exercisable by courts which derive their sole authority from Article III, it is beyond the power of Congress to extend those limits. If there is one subject as to which this Court ought not to feel inhibited in passing on the validity of legislation by doubts of its own competence to judge what Congress has done, it is legislation affecting the jurisdiction of the federal courts. When Congress on a rare occasion through inadvertence or generosity exceeds those limitations, this Court should not good-naturedly ignore such a transgression of congressional powers.

A substantial majority of the Court agrees that each of the two grounds urged in support of the attempt by Congress to extend diversity jurisdiction to cases involving citizens of the District of Columbia must be rejected— but not the same majority. And so, conflicting minorities in combination bring to pass a result—paradoxical as it may appear—which differing majorities of the Court find insupportable.